## UNITED STATES DISTRICT COURT
## DISTRICT OF NORTH DAKOTA
## WESTERN DIVISION

|  |  |  |
|---|---|---|
| MARCUS MITCHELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| MORTON COUNTY SHERIFF KYLE | ) | |
| KIRCHMEIER, MORTON COUNTY, | ) | JURY TRIAL DEMANDED |
| CITY OF BISMARCK, MORTON COUNTY | ) | |
| SHERIFF'S DEPUTY GEORGE PIEHL, | ) | |
| BISMARCK POLICE OFFICER TYLER | ) | |
| WELK, NORTH DAKOTA HIGHWAY | ) | |
| PATROL SERGEANT BENJAMIN | ) | |
| KENNELLY, and JOHN DOES 1-2, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Marcus Mitchell, by his undersigned attorneys, for his complaint against

Defendants Morton County Sheriff Kyle Kirchmeier, Morton County, City of Bismarck, Morton

County Sheriff's Deputy George Piehl, Bismarck Police Officer Tyler Welk, North Dakota

Highway Patrol Sergeant Benjamin Kennelly, and John Does 1-2, alleges as follows:

### INTRODUCTION

1. This action is brought pursuant to 42 U.S.C. § 1983 to redress the grave and

permanent injuries Marcus Mitchell suffered after being hit by "less-lethal" munitions while

peacefully demonstrating against the construction of the Dakota Access Pipeline ("DAPL") and

the deprivation under color of law of Mr. Mitchell's rights as secured by the First, Fourth, and

Fourteenth Amendments to the United States Constitution.

2. In the early hours of January 19, 2017, Mr. Mitchell, then a 21-year-old Navajo

tribal enrolled member, was peacefully protesting DAPL, when law enforcement officers

targeted him as an "agitator" and consequently shot him with bean bag pellets, without cause or provocation.

3.     The bean bag round hit Mr. Mitchell in the left eye, tearing off his skin and shattering the orbital wall of his left eye, before becoming lodged in his eye.  Debilitated by this injury and choking on his own blood, Mr. Mitchell fell to the snow-covered ground and was immediately detained and taken to Sanford Bismarck Medical Center for surgery.

4.     A few months earlier, Mr. Mitchell traveled to North Dakota to join other concerned individuals known as "water protectors" to peacefully object to and make known the consternations of the Standing Rock Sioux Tribe regarding the DAPL carrying oil under a sacred river, lake, and across their ancestral and treaty lands.  Their sustained efforts, from April 2016 through February 2017, gained national attention.

5.     Defendant Sheriff Kyle Kirchmeier of the Morton County Sheriff's Office led and controlled the law enforcement response to the DAPL protests.  Despite the fact that the water protectors were peacefully protesting, law enforcement officers from various agencies, under the direction of Defendant Kirchmeier, became increasingly hostile and aggressive toward the water protectors.  The law enforcement officers followed the policies and practices set by Defendant Kirchmeier to quell the water protectors using any means necessary, including excessive force. The officers used violent tactics against the water protectors for no justifiable reason, including less-lethal weapons like bean bag pellets, rubber bullets, tear gas, pepper spray, and firehoses to spray freezing water.

6.     The Morton County Sheriff's Office-led response to the DAPL protests additionally perpetuated the agency's policy and practice of racially discriminatory policing against the Indigenous community in North Dakota.

## JURISDICTION AND VENUE

7.      This case arises under the U.S. Constitution and the laws of the United States. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343(a)(3).  This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over claims arising under North Dakota state law.

8.      Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted in this complaint occurred in this judicial district.

## PARTIES

9.      Plaintiff MARCUS MITCHELL is Diné from the Navajo Nation, and a United States citizen.  He traveled to North Dakota to support the people of the Oceti Šakowiŋ (otherwise known as the Great Sioux Nation) and their concerns about the desecration of their ancestral land and burial sites and the threat to the environment and water from the construction of the DAPL.

10.     Defendant KYLE KIRCHMEIER is, and was at all times relevant to this action, the Sheriff of the Morton County Sheriff's Office.  Upon information and belief, at all times relevant to this action, Defendant Kirchmeier was the final policymaker for the Morton County Sheriff's Office, and had ultimate decision-making authority over the law enforcement response to the DAPL protests and supervisory authority over the law enforcement officers who responded to the DAPL protests.  Defendant Kirchmeier is sued here in his individual and official capacities.

11.     Defendant MORTON COUNTY is and at all times mentioned herein was a political subdivision created and organized in and under the laws of the State of North Dakota. Morton County operates the Morton County Sheriff's Office.

12.     Defendants GEORGE PIEHL and JOHN DOE 1 are, and were at all times relevant to this action, law enforcement officers, duly appointed and employed as a deputies of the Morton County Sheriff's Office.  As such, they were acting under color of law.  At all times relevant to this action, in the course and scope of their employment with the Morton County Sheriff's Office, Defendants Piehl and John Doe 1 acted under the command of Defendant Kirchmeier and the Morton County Sheriff's Office to engage in the conduct further described in this Complaint.  Defendants Piehl and John Doe 1 are sued in their individual capacities.

13.     Defendants TYLER WELK and JOHN DOE 2 are, and were at all times relevant to this action, law enforcement officers, duly appointed and employed by the Bismarck Police Department.  As such, they were acting under color of law.  At all times relevant to this action, in the course and scope of their employment with the Bismarck Police Department, Defendants Piehl and John Doe 2 acted under the command of Defendant Kirchmeier and the Morton County Sheriff's Office to engage in the conduct further described in this Complaint. Defendants Welk and John Doe 2 are sued in their individual capacities.

14.     Defendant CITY OF BISMARCK is and at all times mentioned herein was a city and municipality organized under the laws of the State of North Dakota.  The City of Bismarck operates the Bismarck Police Department.

15.     Defendant BENJAMIN KENNELLY is, and was at all times relevant to this action, a law enforcement officer, duly appointed and employed by the North Dakota Highway Patrol.  As such, he was acting under color of law.  At all times relevant to this action, in the course and scope of their employment with the North Dakota Highway Patrol, Defendant Kennelly acted under the command of Defendant Kirchmeier and the Morton County Sheriff's

4

Office to engage in the conduct further described in this Complaint.  Defendant Kennelly is sued in his individual capacity.

## FACTUAL ALLEGATIONS

### Background to Marcus Mitchell's Presence in North Dakota

16.     The DAPL was first proposed by Energy Transfer Partners in 2014.  It is a 1,168-mile-long crude oil pipeline that crosses the Missouri River at Lake Oahe, half a mile upstream of the Standing Rock Sioux Reservation.  It runs through the ancestral and treaty lands of the Oceti Šakowiŋ (otherwise known as the Great Sioux Nation).

17.     The Missouri River is the sole water source for the Standing Rock Sioux and Cheyenne River Sioux Tribes and is sacred to the Oceti Šakowiŋ people.

18.     The area through which the DAPL runs, around Lake Oahe, also holds great spiritual, cultural, and historical value for the Standing Rock Sioux and Cheyenne River Sioux Tribes.

19.     The Standing Rock and Cheyenne River tribe members publicly opposed the DAPL because it would threaten their sacred places, burial sites, their vital water supply, the environment, and historic treaty land.  Their rights to their ancestral lands, sacred places, and to a clean and healthy environment are guaranteed by multiple human rights treaties, including the American Declaration of the Rights and Duties of Man, the American Convention on Human Rights, and the United Nations Declaration on the Rights of Indigenous Peoples ("UNDRIP").

20.     Specifically, indigenous peoples are endowed, *inter alia*, with the following additional rights:

a)  Right to be free from any kind of discrimination, in the exercise of their rights, in particular based on their indigenous origin or identity (Article 2, UNDRIP);

b)  Right to self-determination (Article 3, UNDRIP);

c)  Right to practice and revitalize their cultural traditions and customs, including the right to maintain, protect, and develop archaeological, historical, and religious sites (Articles 11, 12, UNDRIP);

d)  Right to "maintain and strengthen their distinctive spiritual relationship with their traditionally owned or otherwise occupied and used lands, territories, waters and coastal seas and other resources and to uphold their responsibilities to future generations in this regard."  (Article 25, UNDRIP); *see also* ("Right to the conservation and protection of the environment," Article 29, UNDRIP).

21.    The Standing Rock Sioux Tribe also objected to the DAPL because its construction violates their national sovereignty, and because the federal government failed to adequately or meaningfully consult them or obtain their consent in contravention of federal law and the UNDRIP.

22.    Over the Tribe's objections, the United States licensed the building of the DAPL. Consequently, the Standing Rock Sioux Nation issued a call to all Sioux and their allies to peacefully stand in support of the Nation's sovereignty and treaty rights and to protect people's essential water.

23.    When the construction of the DAPL began in early 2016, representatives of indigenous nations across the country, known as "water protectors," traveled to North Dakota to support the Standing Rock Sioux Tribe's protest of the pipeline.  The water protectors gathered near the DAPL's construction route and made makeshift camps along the Cannonball River.

24.    The central camp established by the water protectors, which was also known as Oceti Šakowiŋ, was located east of the North Dakota Highway 180 and a mile south of Backwater Bridge.

25.    Backwater Bridge (the "Bridge") is a public bridge located near the Oceti Šakowiŋ camp and is on unceded Sioux territory.  The Bridge was the primary access point to the water protectors' camp, connecting Oceti Šakowiŋ to the nearest highway.

26.    The Standing Rock Sioux and other water protectors peacefully protested the construction of the DAPL, often in the form of prayer.  Their sustained protests gained national attention.

**Law Enforcement's Response to the DAPL Protests, Led by Morton County Sheriff Kirchmeier, Became Increasingly Aggressive and Militarized**

27.    Upon information and belief, Defendant Kirchmeier and the Morton County Sheriff's Office led law enforcement's response to the DAPL protests, giving all the orders to the responding law enforcement personnel in accordance with policies and procedures of Morton County set by Defendant Kirchmeier.

28.    On September 3, 2016, water protectors trying to defend a sacred burial site were attacked and bitten by security dogs commanded by private security guards hired by Energy Transfer Partners.  After this incident, the Morton County Sheriff's Office began maintaining a larger presence at and responding more aggressively to DAPL protests.

29.    Upon information and belief, Defendant Kirchmeier requested the assistance of other North Dakota law enforcement agencies to respond to the DAPL protests.  Officers from other state law enforcement agencies, including the Bismarck Police Department, consequently traveled to Morton County to aid in the response.

30.     On September 8, 2016, Jack Dalrymple, North Dakota's then-governor, activated the North Dakota National Guard, which, along with the North Dakota Highway Patrol, began routinely assisting the Morton County Sheriff's Office in responding to DAPL protests.

31.     In October 2016, North Dakota placed an Emergency Management Assistance Compact request to surrounding states for assistance with the DAPL protests.  Law enforcement officers from states including Wisconsin, South Dakota, Minnesota, Wyoming, Indiana, and Nebraska traveled to Morton County to assist in Defendant Kirchmeier's and the Morton County Sheriff's Office's response to the DAPL protests.

32.     Despite the fact that the water protectors were peacefully protesting, the law enforcement officers responding to the protests, led by the Morton County Sheriff's Office and Defendant Kirchmeier, became increasingly hostile to and aggressive with the water protectors, using violent tactics and munitions to deter and quell the protests.

33.     As the DAPL protests continued, the responding law enforcement officers, including the Defendants, became increasingly militarized.  Responding officers began using less-lethal weapons against water protectors without warning or notices to disperse.

34.     In its response to the DAPL protests, the Morton County Sheriff's Office led by Defendant Kirchmeier employed and maintained policies, practices, and customs of using excessive force against water protectors.  Throughout the DAPL protests, law enforcement officers from the Morton County Sheriff's Office, the Bismarck Police Department, the North Dakota Highway Patrol, and other law enforcement agencies, acting under the direction and supervision of Defendant Kirchmeier, participated in and maintained the Morton County Sheriff's Office policies, practices, and customs of excessive force.

35.     During a DAPL protest on October 22, 2016, law enforcement officers under Defendant Kirchmeier's command fired rubber bullets and sprayed pepper spray, causing numerous protesters to suffer injuries including headaches and difficulty breathing.

36.     On October 27, 2016, hundreds of law enforcement officers wearing tactical riot gear and equipped with pepper spray, shotguns loaded with sponge bullets and bean bags, and other less-lethal weapons, arrived at a DAPL protest site in armored vehicles.  Officers deployed these weapons against protesters, causing numerous injuries.

37.     On November 20 and 21, 2016, hundreds of water protectors gathered on Backwater Bridge near the law enforcement blockade on Highway 1806.  Law enforcement officers wholly failed to provide adequate warnings or announcements to disperse, and as the night of November 20 progressed, officers under the direction and supervision of Defendant Kirchmeier and the Morton County Sheriff's Office indiscriminately deployed freezing water, chemical agents, and other less-lethal weapons, including lead-filled bean bags like the munitions Mr. Mitchell was harmed by, at individuals within the crowd.  Many water protectors suffered serious injuries, including loss of consciousness, facial burns, broken bones, genital injury, and hypothermia as a result of the officers' actions.

38.     In the early morning hours of November 21, 2016, a law enforcement officer acting under the direction and supervision of Defendant Kirchmeier and the Morton County Sheriff's Office launched an explosive munition at Sophia Wilansky, a 21-year-old who was peacefully protesting at Backwater Bridge.  The munition hit and exploded on Wilansky's left forearm, nearly severing her left hand from her arm, and destroying most of the arteries, skin, tissue, muscle, nerves, tendons, and bone in her left forearm.

39.     Defendant Kirchmeier defended law enforcement's use of force, and specifically the use of impact munitions, in response to the DAPL protests, stating, "When we're put in the position of protected areas being overrun by numbers of people, these are lawful tools to quell the advancement."  Defendant Kirchmeier also justified tactics that he claimed were not typical crowd control tactics, such as spraying protesters with water cannons, despite freezing cold temperatures, arguing, "We're not just gonna let people and protesters in large groups come in and threaten officers.  That's not happening."

40.     These violent tactics used to suppress the water protectors violated firmly established human rights which guarantee water protectors the right to actively express opposition to the construction of the DAPL and are contrary to the Universal Declaration of Human Rights, the International Covenant on Civil and Political Rights, and the UN Guiding Principles on Business and Human Rights as well as the First and Fourth Amendments to the United States Constitution.

41.     Law enforcement agencies under the command of Defendant Kirchmeier and the Morton County Sheriff's Office maintained and engaged in these unconstitutional policies and practices of using excessive force throughout their response to the DAPL protests, including the protest where Mr. Mitchell was harmed in January 2017.

**The Defendant Officers' Attack on Marcus Mitchell**

42.     In the fall of 2016, Mr. Mitchell was 21 years old and residing in Arizona with family, when he learned about the Standing Rock Sioux's efforts to protect tribal land and water sources and expose the disastrous effects of the construction of the DAPL.

43.     In November 2016, Mr. Mitchell traveled to the central camp, Oceti Šakowiŋ, to join thousands of other water protectors who were protesting the DAPL's destruction of the

environment, threat to the Standing Rock Sioux's water supply, and desecration of ancestral land.

44.    On the evening of January 18, 2017, and into the early morning hours of January 19, 2017, approximately 200 water protectors gathered at Backwater Bridge to peacefully protest the DAPL.  The water protectors' peaceful protest included praying, chanting, and playing drums.  Elders and women were among the water protectors protesting at the Bridge.

45.    Bismarck Police Officer Josh Brown, Bismarck Police Officer Lane Masters, Defendant Bismarck Police Officer Tyler Welk, Bismarck Police Officer Damian Girodat, Morton County Sheriff's Deputy Cameron McClenahan, Defendant Morton County Sheriff's Deputy George Piehl, North Dakota Highway Patrol Trooper Scott Guenthner, and Defendant North Dakota Highway Patrol Sergeant Benjamin Kennelly were all dispatched to the scene and issued 12 gauge shotguns that deployed drag stabilizing bean bag rounds that they were commanded to and did in fact fire at the water protectors.

46.    Upon information and belief, at all relevant times, Defendant Sergeant Benjamin Kennelly was the scene commander.  He was assigned the "Forward Command" position and directed law enforcement officers during "pushes" during which officers rushed, advanced toward and deployed munitions at the water protectors.

47.    Defendant Kennelly, as commander of the scene, was at all times carrying out the policies of Defendant Kirchmeier and Morton County, directing officers in the implementation of the strategies, actions, and practices that were created, devised, ordained and/or ratified by Defendant Kirchmeier for the County.

48.     Sometime during the late hours of January 18 and the early morning hours of January 19, Mr. Mitchell went to Backwater Bridge when he heard that law enforcement officers were shooting unarmed water protectors, including elders and women, on the Bridge.

49.     As Mr. Mitchell approached the Bridge, he observed from a distance that law enforcement officers were indeed shooting people on the Bridge.

50.     Mr. Mitchell positioned himself in front of women and elders in the crowd, and maintained a distance of no less than 20 feet away from a line of law enforcement officers, which included those he identified as members of the Morton County Sheriff's Office and the Bismarck Police Department.

51.     Mr. Mitchell was unarmed and standing among other unarmed water protectors, generally keeping his hands raised above his head to make clear to the law enforcement officers that he was unarmed and peaceful.

52.     Upon information and belief, Defendants singled out certain water protectors, including Mr. Mitchell, whom they deemed to be "agitators" of the protests for arrest in order to particularly punish them, stop the protest, and chill the rights of other water protectors as documented in law enforcement reports after Mr. Mitchell was shot.  The Defendants made a plan to shoot and arrest Mr. Mitchell at Backwater Bridge, despite the fact that Mr. Mitchell was protesting peacefully.

53.     With his hands raised in the air, Mr. Mitchell said "Mni Wiconi," which means "water is life" in the Lakota language.  Mr. Mitchell presented no threat to the law enforcement officers, including the Defendants.

54.    Upon a countdown, and without cause or justification, Defendant Morton County Sheriff's Deputy Piehl and Defendant Morton County Sheriff's Deputy John Doe 1 shot at Mr. Mitchell with a 12 gauge less-than-lethal shotgun loaded with drag stabilizing bean bag rounds.

55.    At about the same time, also without cause of justification, Defendant Bismarck Police Department Swat Officer Tyler Welk and Defendant Bismarck Police Department Officer John Doe 2 shot at Mr. Mitchell with a 12 gauge less than lethal shotgun loaded with drag stabilizing bean bag rounds.

56.    Mr. Mitchell was hit in the face, leg, and in the back of his head by the Defendant Officers.

57.    A bean bag round shot by the Defendant Officers entered Mr. Mitchell's left eye socket, shattering the orbital wall of his eye and his cheekbone, and ripping open a flap of skin nearly to his left ear.  The bean bag round became lodged into his eye, with strands of the round protruding out of his left eye socket.

58.    Defendant Kennelly had the duty and opportunity to intervene on Mr. Mitchell's behalf, but did nothing to assist him, and in fact directed, encouraged, and/or facilitated the Defendant Officers' shooting of Mr. Mitchell.

59.    After being shot, Mr. Mitchell became disoriented and fell face down to the ground, which was covered in snow.  His nostrils filled with blood and he was unable to breathe, causing him to feel like he was drowning in his own blood.

60.    Law enforcement officers immediately approached Mr. Mitchell and pinned him to the ground, placing their knees on his body, and holding him down in the snow.  Officers then handcuffed Mr. Mitchell tightly behind his back and pulled him up and into a vehicle, as he was unable to get up on his own.

61.     While in the vehicle, an officer held Mr. Mitchell so tightly that he was again unable to breathe.  Mr. Mitchell could not see through the blood on his face.  He remained in the vehicle in pain and unable to see, physically pinned by an officer, and told not to move.  Officers profanely denied Mr. Mitchell's requests for water.

62.     Mr. Mitchell was finally transported to Sanford Bismarck Medical Center via ambulance, accompanied by Morton County Sheriff's Office deputies.  When he arrived at the hospital, Mr. Mitchell was unable to walk on his own or see from his left eye.  He fainted, and when he awoke, he found himself restrained, with his left wrist and right leg cuffed to the hospital bed.

63.     Doctors advised Mr. Mitchell that he had undergone a surgical operation to remove the bean bag round from his face and eye.  He could not see out of his left eye, and he was in pain and felt disoriented.

64.     While he was disoriented and in pain and restrained in the hospital bed, two North Dakota law enforcement officers interrogated him about the Oceti Šakowiŋ camp.  The officers asked him about the water protectors' upcoming plans and whether there were weapons present at the camp.

65.     For a day and half, Mr. Mitchell lay alone in his hospital bed.  He later learned that people were desperately searching for him, but could not find him, because law enforcement officers, in collusion with hospital staff, concealed his whereabouts.  His friends and supporters eventually found him shackled to a gurney in the hospital after his surgery.

66.     As a result of the Defendant Officers' actions, Mr. Mitchell suffered irreparable harm to his left eye, to his vision and hearing, and to his sense of smell, in addition to suffering

from chronic and debilitating pain on the left side of his face. He has since undergone several medical procedures to treat his injuries.

67. Mr. Mitchell has not yet fully recovered from the injuries he suffered as a result of the Defendant Officers' actions. In addition, for his treatment at Sanford Bismarck Medical Center, Mr. Mitchell faces a debt of several hundred thousand dollars.

68. Law enforcement officers charged Mr. Mitchell with criminal trespass and obstruction of a government function in connection with the abovementioned events, carrying a maximum sentence of two years in prison and $6,000 in fines.

69. Mr. Mitchell did not know about the criminal charges while he was held at Sanford Bismarck Medical Center. Even though Morton County Sherriff's Office officers knew that Mr. Mitchell was in the hospital, they did not advise him of the charges against him or that he was expected to appear in court. As a result, a warrant was issued against Mr. Mitchell, and he was forced to retain counsel to quash the warrant.

70. The criminal charges required Mr. Mitchell to travel extensively between his home in New Mexico to North Dakota and Illinois. The charges were ultimately resolved through a pretrial diversion agreement that resulted in the dismissal of the charges.

71. By bringing broad and ill-defined charges against Mr. Mitchell, law enforcement officers unlawfully criminalized Mr. Mitchell's right to defend indigenous sacred land and resources recognized in the United Nations Declaration on the Rights of Indigenous Peoples and the United Nations Declaration on Human Rights Defenders.

72. As a result of the Defendants' actions, Mr. Mitchell has also suffered from extraordinary mental and physical trauma, additional pain and suffering, and complete disruption of his enjoyment of daily life.

**The Less-Lethal Weapons Used Against Mr. Mitchell and Other Water Protectors by the Morton County Sheriff's Office and the Other Law Enforcement Agencies Can Lead to Severe Injury and Death, Even When Properly Employed**

73.      Throughout the fall of 2016 and the winter of 2017, Defendant Kirchmeier and the Morton County Sheriff's Office regularly equipped the law enforcement officers under their direction, supervision, and authority with less-lethal weapons, including bean bag guns.  Upon information and belief, many of these law enforcement officers, including the Morton County Sheriff's Office deputies and the Bismarck Police Department officers, lacked adequate training in the appropriate use of these less-lethal weapons.

74.      The law enforcement officers continually deployed these less-lethal weapons at DAPL protests throughout late 2016 and early 2017, including at the protest where Mr. Mitchell was injured on January 19, 2017.

75.      The purpose of less-lethal weapons is pain compliance, or the intentional infliction of pain, distress, and fear to compel compliance with claimed law enforcement's desires.

76.      The less-lethal weapons used by these law enforcement officers included bean bag pellets, which the Defendant Officers shot Mr. Mitchell with on January 19, 2017.

77.      Less-lethal weapons, particularly if deployed indiscriminately or inappropriately, are dangerous; they can cause severe injuries, including death.  Consequently, the use of less-lethal weapons needs to be highly regulated and carefully circumscribed and controlled by law enforcement supervisors on scene and by appropriate local governmental policy.

78.      The manufacturers and suppliers of less-lethal weapons advise that these weapons should only be used by law enforcement officers who have successfully completed formal and adequate training in their appropriate use.  The websites for Defense Technologies (a less-lethal

weapon manufacturer) and Safariland Group (a less-lethal weapon supplier) include links to formal training courses for law enforcement officers on the use of less-lethal weapons.

79.    POLICE Magazine, a law enforcement magazine, urges law enforcement agencies to carefully consider equipment, training, and protocol, policy, and procedure prior to implementing bean bag pellet rounds into its less-lethal force options.  Matthew Barge, a police policies expert and the executive director of the New York office of the Police Assessment Resource Center, was quoted in a news report that law enforcement agencies typically limit the use of bean bag pellets to specially trained officers and supervisors.

80.    A former commander with the Los Angeles Police Department cautioned against the use of bean bag pellets entirely, as even with proper training and protocols, there is a risk of serious or fatal injury if an officer fires a gun containing bean bag pellets at a person's head—which happened here to Mr. Mitchell—which can be difficult to avoid in certain circumstances. Further, strong winds or the force of a bean bag pouch's rotation after it is shot can cause unintended severe injuries or fatalities.

81.    Model policies for use of bean bag pellets dictate that officers should aim bean bag rounds at the abdomen, thighs, or forearms, and should avoid targeting the head, neck, and groin.

82.    According to a report by the American Civil Liberties Union of Massachusetts, less-lethal impact projectiles such as bean bag pellets can cause severe trauma, including organ damage and permanent physical disability, or death if used at close range, and can be particularly dangerous if they strike an individual's head, throat, or heart area.

83.    As bean bag munitions have become an increasingly popular choice of less-lethal weapon for law enforcement agencies over the last several decades, there have been numerous

widely publicized incidents where individuals were severely injured or died as a result of being hit with bean bag pellets.

    a)  In 2002, a woman in Long Beach California died from her injuries after she was hit in the chest with a bean bag projectile.

    b)  In 2004, police shot a man in the head with bean bag projectiles during a protest in Miami, Florida. The man was also hit with rubber bullets when he fell to the ground, and alleged that he suffered permanent nerve damage as a result of the incident.

    c)  In 2004, a 21-year-old woman died as a result of her injuries after she was hit with a bean bag pellet fired by Boston police during a post-game celebration outside of Fenway Park.

    d)  In 2005, a man in Columbus, Georgia died after police shot him in the spleen area with bean bag pellets from about 25 feet away.

    e)  In 2013, a 95-year-old man in Chicago, Illinois died due to blunt force trauma to his abdomen after police shot him with a bean bag gun.

    f)  In October 2017, an undersheriff in Barber County, Kansas, fired a bean bag round at an unarmed man from less than ten feet away. The round fatally wounded the man when it hit him in the chest.

    g)  In May 2018, a Los Angeles man died after police officers used a stun gun and fired bean bag rounds at him.

84.    Upon information and belief, it is standard policy in law enforcement agencies across the country that less-lethal weapons such as bean bag guns be handled and deployed only

by law enforcement officers who have taken and passed formal training courses in the appropriate use of such weapons.

85.    As of January 2017, it was obvious to any qualified and reasonably competent law enforcement supervisor and policymaker that bean bag guns and other less-lethal weapons are dangerous and can cause serious bodily harm, and potentially death, if deployed in too close proximity to an individual or towards a person's head.

86.    Upon information and belief, throughout Fall 2016 and Winter 2017, the Morton County Sheriff's Office and the other law enforcement agencies under its command routinely distributed bean bag guns and other less-lethal weapons to law enforcement officers who lacked sufficient training in the proper use of such devices.

87.    Upon information and belief, prior to Mr. Mitchell's injury, law enforcement officers responding to DAPL protests and acting under the authority, direction, and supervision of Defendant Kirchmeier and the Morton County Sheriff's Office routinely and indiscriminately used bean bag guns and other less-lethal weapons at unsafe distances and without precise aim to avoid body parts presenting a higher risk of serious injury or fatality.

**The Morton County Sheriff's Office Has Policies, Practices, and Longstanding Customs of Racially Discriminatory Policing**

88.    Law enforcement relations with the Indigenous community in Morton County, and more generally in North Dakota, have been marked by episodes of tension and violence for generations.  The law enforcement response to the DAPL protests, including the protest on January 19, 2017, where Mr. Mitchell was harmed, must be seen in this historical context.

89.    According to an article published in September 2016, "many Native Americans say they feel [contempt] from North Dakotans and particularly from police."  Defendants have a history of discriminating against and racially profiling individuals in Indigenous communities.

19

John Floberg, a priest who has lived at Standing Rock for twenty-five years, stated, "It's been my experience that [The Morton County Sheriff's Office] [racially] profiles."  Floberg further explained that the police department establishes highway patrols "at key times when they know Native traffic is moving on the reservation, profiling for drunk driving, driving without a license or without insurance."

90.    Upon information and belief, during the early stage of the DAPL protests—from August 2016 to October 2016—the Morton County Sheriff's Office assigned law enforcement officers to escort school buses filled with white children through areas where groups of Indigenous people were camped out, peacefully protesting, near a highway in North Dakota. These actions were intended to suggest to the white children that Indigenous people are dangerous.

91.    The Morton County Sheriff's Office's response to the DAPL protests further exhibited its policies, practices, and longstanding customs of racially discriminatory policing. On October 24, 2016, Defendant Kirchmeier and other officials from the state of North Dakota closed Highway 1806 from Fort Rice to Fort Yates.  Highway 1806 was a vitally important means of transportation for tens of thousands of water protectors.  Highway 1806 also serves as a key north-south public right-of-way for residents of south-central North Dakota, north-central South Dakota, the Standing Rock Reservation, and the Cheyenne River Reservation.  From October 2016 to March 2017, Defendant Kirchmeier and other North Dakota officials maintained a reinforced barricade on Highway 1806 and additionally enforced a prohibition on water protector travel by foot, horseback, and ATV, which prevented travel on an approximately nine-mile stretch of this public right-of-way.

92.     The effect and intent of Defendant Kirchmeier and the other official's conduct was to punish, retaliate, discriminate against, and severely burden residents of the neighboring reservation by limiting access to people traveling to and from the reservation.  Additionally, this region of North Dakota experienced severe winter weather for much of the period of the road closures, including multiple major blizzards and prolonged periods of sub-zero temperatures.  In conjunction with Defendants' closure of the quickest and safest route to the nearest major hospital in Bismarck and to the nearest source of many life-saving supplies, this weather greatly increased the risk of serious bodily injury and death to those gathered by the Cannonball River, as well as those who resided on the nearby reservation.  These actions by Defendant Kirchmeier and the other state officials substantially and disproportionately impacted the Standing Rock Sioux Tribe and tribal members.

93.     In the aftermath of the DAPL protests, hundreds of thousands of supporters signed an online petition to remove Defendant Kirchmeier from his position as Sheriff at the Morton County Sheriff's Office.  The supporters of the petition alleged that Defendant Kirchmeier led a biased, militarized, and violent response to the DAPL protests that involved biased, constant surveillance and questioning, as well as regular harassment of ranchers and farmers in the area where the protests took place.

## COUNT I – EXCESSIVE FORCE
**(Fourth Amendment Claim for Damages under 42 U.S.C § 1983 Against Defendants Piehl, Welk, and John Does 1-2)**

94.     Mr. Mitchell repeats and realleges the preceding paragraphs as if fully set forth in this Count.

95.    Count I is alleged against Defendants Morton County Sheriff's Deputy Piehl, Bismarck Police Officer Welk, Morton County Sheriff's Deputy John Doe 1, and Bismarck Police Officer John Doe 2.

96.    The actions of the Defendants described herein, which included shooting Mr. Mitchell with bean bag rounds, without legal cause, constituted objectively unreasonable excessive force and violated Mr. Mitchell's rights under the Fourth Amendment to the U.S Constitution, as applied to the states under the Fourteenth Amendment.

97.    The Defendants' above-described actions were undertaken intentionally, with malice and knowing disregard for Mr. Mitchell's clearly established constitutional rights.

98.    The Defendants' actions were the direct and proximate cause of the violation of Mr. Mitchell's Fourth Amendment rights and the damages he suffered, including bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of liberty, loss of income, and legal expenses, as set forth more fully above.

## COUNT II – FREEDOM OF SPEECH AND ASSOCIATION
**(First Amendment Claim for Damages under 42 U.S.C § 1983 Against Defendants Piehl, Welk, and John Does 1-2)**

99.    Mr. Mitchell repeats and realleges the preceding paragraphs as if fully set forth in this Count.

100.    Count II is alleged against Defendants Morton County Sheriff's Deputy Piehl, Bismarck Police Officer Welk, Morton County Sheriff's Deputy John Doe 1, and Bismarck Police Officer John Doe 2.

101.    As described in detail above, Mr. Mitchell engaged in constitutionally-protected speech by peacefully taking part in a demonstration, the goal of which was to support the Standing Rock Sioux Tribe in its opposition of the construction of the DAPL.  Mr. Mitchell has a

fundamental right to assemble and express his views protected by the freedom of association and freedom of speech clauses of the First Amendment, as applied to the states under the Fourteenth Amendment of the United States Constitution.

102.    The Defendants' actions violated Mr. Mitchell's rights under the First Amendment to freedom of speech and freedom of assembly by interfering with his ability to associate freely in public and express his views as part of a peaceful demonstration.  The Defendants caused Mr. Mitchell to suffer injuries that would chill a person of ordinary firmness from continuing to engage in that activity.

103.    The Defendants engaged in these unlawful actions willingly and knowingly, acting with reckless or deliberate indifference to Mr. Mitchell's First Amendment rights.

104.    As a direct and proximate result of the Defendants' actions, Mr. Mitchell suffered damages, including bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of liberty, loss of income, and legal expenses, as set forth more fully above.

### COUNT III – FIRST AMENDMENT – RETALIATORY USE OF FORCE
### (First Amendment Claim for Damages under 42 U.S.C § 1983 Against Defendants Piehl, Welk, and John Does 1-2)

105.    Mr. Mitchell repeats and realleges the preceding paragraphs as if fully set forth in this Count.

106.    Count III is alleged against Defendants Morton County Sheriff's Deputy Piehl, Bismarck Police Officer Welk, Morton County Sheriff's Deputy John Doe 1, and Bismarck Police Officer John Doe 2.

107.    As described in detail above, Mr. Mitchell was engaged in constitutionally-protected speech by peacefully taking part in the DAPL demonstration.

108.    The Defendant retaliated against Mr. Mitchell for engaging in protected speech by subjecting him to excessive force without legal justification.  Mr. Mitchell's association with the water protectors and opposition to the DAPL were substantial and motivating factors for the Defendants' use of force against him.  The Defendants' actions were intended to make Mr. Mitchell, who they identified as an agitator, and other people engaging in constitutionally-protected speech and expression at the DAPL protests wary of continuing to engage in such protected activities in the future and specifically to chill their rights guaranteed under the First Amendment.

109.    The Defendants' retaliatory conduct violated Mr. Mitchell's right to free speech under the First and Fourteenth Amendments to the United States Constitution.

110.    At all relevant times, the Defendants were aware that Mr. Mitchell was engaged in constitutionally-protected speech when they violated his rights.  The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Mr. Mitchell's clearly established constitutional rights.

111.    As a direct and proximate result of the Defendants' actions, Mr. Mitchell suffered damages, including bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of liberty, loss of income, and legal expenses, as set forth more fully above.

**COUNT IV - FIRST AMENDMENT – RETALIATORY ARREST**
**(First Amendment Claim for Damages under 42 U.S.C § 1983 Against Defendants Piehl, Welk, and John Does 1-2)**

112.    Mr. Mitchell repeats and realleges the preceding paragraphs as if fully set forth in this Count.

113.    Count IV is alleged against Defendants Morton County Sheriff's Deputy Piehl, Bismarck Police Officer Welk, Morton County Sheriff's Deputy John Doe 1, and Bismarck Police Officer John Doe 2.

114.    As described in detail above, Mr. Mitchell was engaged in constitutionally-protected speech by peacefully taking part in the DAPL demonstration.

115.    The Defendants retaliated against Mr. Mitchell for engaging in protected speech by causing him to be arrested without probable cause.  Mr. Mitchell's association with the water protectors and opposition to the DAPL were substantial and motivating factors for the Defendants' actions to cause him to be arrested.  The Defendants' actions were intended to make Mr. Mitchell, who they identified as an agitator, and other people engaging in constitutionally-protected speech and expression at the DAPL protests wary of continuing to engage in such protected activities in the future and specifically to chill their rights guaranteed under the First Amendment.

116.    The Defendants' retaliatory conduct violated Mr. Mitchell's right to free speech under the First and Fourth Amendments to the United States Constitution.

117.    At all relevant times, the Defendants were aware that Mr. Mitchell was engaged in constitutionally-protected speech when they violated his rights.  The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Mr. Mitchell's clearly established constitutional rights.

118.    As a direct and proximate result of the Defendants' actions, Mr. Mitchell suffered damages, including bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of liberty, loss of income, and legal expenses, as set forth more fully above.

**COUNT V – CONSPIRACY**
**(42 U.S.C § 1983 Claim for Civil Conspiracy to Deprive Mr. Mitchell of his Civil Rights Against All Individual Defendants)**

119.    Mr. Mitchell repeats and realleges the preceding paragraphs as if fully set forth in this Count.

120.    Count V is alleged against Defendants Morton County Sheriff Kirchmeier, Morton County Sheriff's Deputy Piehl, Bismarck Police Officer Welk, North Dakota Highway Patrol Sergeant Kennelly, Morton County Sheriff's Deputy John Doe 1, and Bismarck Police Officer John Doe 2.

121.    Each of the Defendants, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

122.    Each of the Defendants took concrete steps to enter into an agreement in January 2017 to unlawfully use force to quell the constitutionally protected activities of individuals participating in the DAPL protests, including Mr. Mitchell, knowing they lacked legal justification to do so, and for the purpose of violating Plaintiff's Fourth Amendment rights as well as his First Amendment rights to protest by engaging in non-disruptive speech in support of an issue of pressing public importance.

123.    In furtherance of this conspiracy, each of the Defendants committed specific overt acts, misusing their police powers for the purpose of violating Mr. Mitchell's rights and unlawfully silencing him.  They accomplished this goal by using excessive force by shooting bean bag pellets at him to prevent Mr. Mitchell from continuing to peacefully protest the construction of the DAPL.

124.    In the implementation of the conspiracy, the Individual Defendant Officers, led by Defendant Kirchmeier, employed the customs and policies of excessive force and discriminatory policing, as set out more fully above.

125.    Each individual Defendant is therefore liable for the violation of Mr. Mitchell's rights by any other individual Defendant.

126.    As a direct and proximate result of the Defendants' conspiracy, Mr. Mitchell suffered damages, including bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of liberty, loss of income, and legal expenses, as set forth more fully above.

### COUNT VI – EQUAL PROTECTION
**(Fourteenth Amendment Claim for Damages under 42 U.S.C § 1983 Against Defendants Piehl, Welk, and John Does 1-2)**

127.    Mr. Mitchell repeats and realleges the preceding paragraphs as if fully set forth in this Count.

128.    Count VI is alleged against Defendants Morton County Sheriff's Deputy Piehl, Bismarck Police Officer Welk, Morton County Sheriff's Deputy John Doe 1, and Bismarck Police Officer John Doe 2.

129.    The Defendants intentionally discriminated against Mr. Mitchell on the basis of his status as an Indigenous person and his political and religious beliefs in opposition to DAPL, in violation of the equal protection clause of the Fourteenth Amendment and in wanton disregard of the International Covenant on Civil and Political Rights and the United Nations Declaration on the Rights of Indigenous Peoples which guarantees Mr. Mitchell equal protection of the law without discrimination and constitutes the minimum standards for the survival, dignity, and well-being of the indigenous peoples of the world.

130.    As explained in detail above, the Defendants acted upon discriminatory animus when they targeted him for arrest and used excessive force against him to quell his First Amendment rights.

131.    As a direct and proximate result of the Defendants' actions, Mr. Mitchell suffered damages, including bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of liberty, loss of income, and legal expenses, as set forth more fully above.

**COUNT VII – CONSPIRACY**
**(42 U.S.C § 1983 Claim for Racially-Motivated Civil Conspiracy Against All Individual Defendants)**

132.    Mr. Mitchell repeats and realleges the preceding paragraphs as if fully set forth in this Count.

133.    Count VII is alleged against Defendants Morton County Sheriff Kirchmeier, Morton County Sheriff's Deputy Piehl, Bismarck Police Officer Welk, North Dakota Highway Patrol Sergeant Kennelly, Morton County Sheriff's Deputy John Doe 1, and Bismarck Police Officer John Doe 2.

134.    Each of the Defendants, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

135.    The purpose of this conspiracy was to deprive of equal protection of the laws, as guaranteed to them by the Fourteenth Amendment and the International Covenant on Civil and Political Rights and the United Nations Declaration on the Rights of Indigenous Peoples, those Indigenous citizens who engaged in protest and to deny them the privileges and immunities of liberty and the right to petition the government for the redress of grievances.

136.    The Defendants conspired with racial animus toward Mr. Mitchell and other Indigenous people who were protesting the DAPL to use excessive force to quell their speech. The conspiratorial agreement was effectuated as part of a long-standing pattern of racially discriminatory and racially targeted policing in Morton County.

137.    In the implementation of the conspiracy, the Individual Defendant Officers, led by Defendant Kirchmeier, employed the customs and policies of discriminatory policing and excessive force, as set out more fully above.

138.    Each individual Defendant is therefore liable for the violation of Mr. Mitchell's rights by any other individual Defendant.

139.    As a direct and proximate result of the Defendants' conspiracy, Mr. Mitchell suffered damages, including bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of liberty, loss of income, and legal expenses, as set forth more fully above.

**COUNT VIII – FAILURE TO INTERVENE**
**(42 U.S.C § 1983 Claim for Failure to Intervene Against Defendant Kennelly)**

140.    Mr. Mitchell repeats and realleges the preceding paragraphs as if fully set forth in this Count.

141.    Count VIII is alleged against Defendant North Dakota Highway Patrol Sergeant Kennelly.

142.    Defendant Kennelly had the opportunity and the duty to intervene on behalf of Mr. Mitchell and prevent the constitutional violations described above, but declined or refused to do so.

143.    As a direct and proximate result of the Defendant's actions, Mr. Mitchell suffered damages, including bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of liberty, loss of income, and legal expenses, as set forth more fully above.

## COUNT IX – UNLAWFUL POLICY AND PRACTICE
### (*Monell* Claim for Damages under 42 U.S.C § 1983 Against Defendant Kirchmeier)

144.    Mr. Mitchell repeats and realleges the preceding paragraphs as if fully set forth in this Count.

145.    Count IX is alleged against Defendant Sheriff Kirchmeier in his official capacity.

146.    The Defendants, acted under the color of the law, and under the authority of one or more interrelated de facto policies, practices, and/or customs of the Morton County Sheriff's Office, to violate Mr. Mitchell's right as set forth in the preceding claims.

147.    Defendant Kirchmeier, in his role as Sheriff of Morton County, was the final policymaker for the law enforcement response to the DAPL protests.

148.    Defendant Sheriff Kirchmeier developed and maintained policies, practices, procedures, and customs of using excessive force and discriminatory policing against the water protectors, and led and commanded other law enforcement agencies under his control to engage in the same, exhibiting deliberate indifference to the constitutional rights of Mr. Mitchell and Mr. Mitchell's rights under the International Covenant on Civil and Political Rights, the United Nations Declaration on the Rights of Indigenous Peoples, and the Universal Declaration of Human Rights, including but not limited to those policies, practices, procedures, and customs described above, which caused the violation of Mr. Mitchell's rights as described herein and the resultant damages suffered.

149.    Defendant Sheriff Kirchmeier had the power to prevent or aid in the prevention of the wrongs done and conspired to be done as described herein, yet failed or refused to do so, in violation of 42 U.S.C. § 1983.

150.    Upon information and belief, Defendant Kirchmeier was deliberately indifferent to the need for further training, supervision, or discipline related to the use of less-lethal weapons

and nondiscriminatory policing tactics, as reflected by the continued maintenance of the policies, practices, and customs of using excessive force and discriminatory policing that was carried out by the law enforcement officers under his control.

151.    Moreover, the actions of Individual Officer Defendants as alleged in this Complaint were the result of widespread policy, practice, and custom, as further established by the involvement in, and direction, condoning, and/or ratification by Defendant Sheriff Kirchmeier, the final policymaker for the Morton County Sheriff's Office.

152.    The actions and omissions of Defendant Sheriff Kirchmeier as described herein were done with knowing disregard for the constitutional rights of the Mr. Mitchell.  Defendant Kirchmeier acted maliciously, willfully, wantonly, and in reckless disregard of Mr. Mitchell's rights under the constitution and international law.

153.    The policies, practices, procedures, and customs of the Morton County Sheriff's Office were the direct and proximate cause of the violations of Mr. Mitchell's constitutional rights and the damages he suffered, including bodily injury, pain, suffering, mental distress, anguish, loss of liberty, loss of income, and legal expenses, as set forth more fully above.

**COUNT X – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(State Law Claim Against All Individual Defendants)**

154.    Mr. Mitchell repeats and realleges the preceding paragraphs as if fully set forth in this Count.

155.    Count X is alleged against Defendants Morton County Sheriff Kirchmeier, Morton County Sheriff's Deputy Piehl, Bismarck Police Officer Welk, North Dakota Highway Patrol Sergeant Kennelly, Morton County Sheriff's Deputy John Doe 1, and Bismarck Police Officer John Doe 2.

156.    The acts and conduct of the Defendants, as set forth above, were extreme and

outrageous.  The Defendants' actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Mr. Mitchell, as is more fully alleged above.

157.    As a direct and proximate result of the Defendants' actions, Mr. Mitchell suffered damages, including bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of liberty, loss of income, and legal expenses, as set forth more fully above.

## COUNT XI – RESPONDEAT SUPERIOR
**(State Law Claim Against Defendants Morton County and City of Bismarck)**

158.    Mr. Mitchell repeats and realleges the preceding paragraphs as if fully set forth in this Count.

159.    Count XI is alleged against Defendants Morton County and City of Bismarck.

160.    In committing the acts alleged in the preceding paragraphs, Defendants Deputy George Piehl and Officer John Doe 1 were employees, members, and agents of the Morton County Sheriff's Office and Morton County, acting at all relevant times within the scope of their employment and under color of law.

161.    Defendant Morton County is thereby liable as principal for all state law torts committed by its agents.

162.    In committing the acts alleged in the preceding paragraphs, Defendants Officer Tyler Welk and Officer John Doe 2 were employees, members, and agents of the Bismarck Police Department and the City of Bismarck, acting at all relevant times within the scope of their employment and under color of law.

163.    Defendant City of Bismarck is thereby liable as principal for all state law torts committed by its agents.

## COUNT XII – INDEMNIFICATION
### (State Law Claim Against Defendants Morton County and City of Bismarck)

164.    Mr. Mitchell repeats and realleges the preceding paragraphs as if fully set forth in this Count.

165.    Count XII is alleged against Defendants Morton County and City of Bismarck.

166.    In North Dakota, pursuant to N.D. Cent. Code § 32-12.1, political subdivisions are directed to pay any money damages for injuries for which employees are liable within the scope of their employment activities.

167.    The Individual Officer Defendants acted within the scope of their employment in committing the misconduct described herein.  Therefore, Defendant Morton County and Defendant City of Bismarck are liable as their employers for any resulting damages or award of attorney's fees.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Marcus Mitchell requests that this Court enter judgment in his favor against Defendants, awarding compensatory damages, costs and attorneys' fees, and punitive damages against each of the Defendants in their individual capacities, and for such further additional relief as this Court may deem appropriate and just.

## JURY DEMAND

Plaintiff demands trial by jury.


Dated: July 18, 2019

                                        Respectfully submitted,

                                        **MARCUS MITCHELL**

                                        By: /s/ Vanessa del Valle
                                             One of his attorneys

Sheila A. Bedi
Vanessa del Valle
Roderick and Solange MacArthur Justice Center
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611
(312) 503-1271
sheila.bedi@law.northwestern.edu
vanessa.delvalle@law.northwestern.edu


Shubra Ohri
53 W Jackson Blvd.
Suite 638
Chicago, Illinois 60604
shubraohri@gmail.com


Lawrence E. Chacon
826 5th St. NW
Albuquerque, New Mexico 87102
Ph (505) 843-9495
Fax (505) 243-0098
lawchacon@comcast.net