**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

Marcus Mitchell,

                                        Plaintiff,

vs.

Morton County Sheriff Kyle Kirchmeier,                 Civil No.: 1:19-cv-149
Morton County, City of Bismarck, Morton
County Sheriff's Deputy George Piehl,
Bismarck Police Officer Tyler Welk, North
Dakota Highway Patrol Sergeant Benjamin
Kennelly, and John Does 1-2,

                                        Defendants.

---

**ORDER GRANTING DEFENDANT KENNELLY'S MOTION TO DISMISS,**
**AND GRANTING CITY AND COUNTY DEFENDANTS' MOTION TO DISMISS**

---

[¶1]      THIS MATTER comes before the Court on the Motions to Dismiss filed by State Defendant North Dakota Highway Patrol Sergeant Benjamin Kennelly ("Defendant Kennelly") and City and County Defendants Morton County Sheriff Kyle Kirchmeier, Morton County, City of Bismarck, Morton County Sheriff's Deputy George Piehl, Bismarck Police Officer Tyler Welk, and John Does 1-2 ("City and County Defendants"). Doc. Nos. 22, 24. Plaintiff Marcus Mitchell ("Mitchell") filed a Consolidated Opposition to both Motions on November 8, 2019. Doc. No. 31. Defendant Kennelly replied in support of his Motion on November 22, 2019. Doc. No. 35. The City and County Defendants replied in support of their Motion on November 22, 2019. Doc. No. 36. For the reasons explained below, Defendant Kennelly's Motion to Dismiss is **GRANTED** and the City and County Defendants' Motion to Dismiss is **GRANTED**.

## I.    FACTUAL BACKGROUND

[¶2]    The facts are taken from the Complaint and assumed to be true for purposes of ruling on the present Motions. See Minnesota Majority v. Mansky, 708 F.3d 1051, 1056 (8th Cir. 2013).

[¶3]    Marcus Mitchell, an enrolled member of the Navajo Nation living in Arizona, travelled to North Dakota in November of 2016 to join the Standing Rock and Cheyenne River Sioux Tribes and their supporters in advocating against the construction of the Dakota Access Pipeline ("DAPL"), which was slated to cross the Missouri River a few miles north of the Standing Rock Tribe's Reservation. Doc. Nos. 1, ¶¶2, 43. According to Mitchell, the Tribes opposed the location and construction of the Pipeline, asserting it would endanger their water supply and the environment, disrupt cultural sites, and threaten historic treaty land. Doc. No. 1, ¶19. Mitchell asserts, after the federal government "failed to adequately or meaningfully consult them or obtain their consent in contravention of federal law and the [United Nations Declaration on the Rights of Indigenous Peoples]" (UNDRIP),[1] the Standing Rock Sioux Tribe issued "a call to all Sioux and their allies to peacefully stand in support of the Nation's sovereignty and treaty rights and to protect people's essential water." Doc. No. 1, ¶¶20-22. Mitchell joined the Tribes and their supporters in

---

[1] Mitchell asserts UNDRIP guarantees the Standing Rock and Cheyenne River Sioux Tribes the right to their ancestral lands, to a healthy and clean environment, and access to their sacred places. Doc. No. 1, ¶19. Specifically, he alleges Articles 2 (freedom from discrimination), 3 (right to self-determination), 11 (right to practice cultural traditions, including the right to maintain and protect sites), 12 (same), 25 (right to maintain and strengthen spiritual relationship with lands and waters and to uphold responsibility to future generations), and 29 (right to conservation and protection of the environment) are relevant in regard to the DAPL construction.

Mitchell acknowledges his claims are based upon federal and state law and are not based upon violations of these declarations or covenants. Instead, he states he "makes reference in his Complaint to the Defendants' violation of international human rights standards as outlined in various declarations and covenants [as] further proof of the Defendants' wanton disregard of the rights and interest of Plaintiff and other water protectors." Doc. No. 31, p. 7, n. 1.

vocalizing this message, including spending time at the protestors' main camp, Oceti Sakowin, located near Highway 1806 and the Backwater Bridge. Doc. No. 1, ¶¶24, 25, 43.

[¶4]    Mitchell maintains the protests against DAPL began in April of 2016. Doc. No. 1, ¶5. Mitchell asserts law enforcement presence at protest sites increased on September 3, 2016, after an incident involving the protestors and private security guards hired by Energy Transfer Partners. Doc. No. 1, ¶28. Mitchell indicates several protestors were attacked and bitten by security dogs handled by the security guards. Doc. No. 1, ¶28. As a result, he asserts, the Morton County Sheriff's Office began "maintaining a larger presence at and responding more aggressively to DAPL protests." Doc. No. 1, ¶28.

[¶5]    This larger presence included the Bismarck Police Department, the North Dakota National Guard which was activated by the Governor on September 8, 2016, and the North Dakota Highway Patrol. Doc. No. 1, ¶¶29, 30. In addition, in October 2016, North Dakota issued an "Emergency Management Assistance Compact" request to surrounding states for assistance at the DAPL protest sites. Doc. No. 1, ¶31. In response, law enforcement agencies from numerous states, including Wisconsin, South Dakota, Minnesota, Wyoming, Indiana, and Nebraska joined Morton County and other North Dakota law enforcement agencies at the protest sites. Doc. No. 1, ¶31.

[¶6]    Mitchell asserts these officers, who were "led by the Morton County Sheriff's Office and Defendant Kirchmeier, became increasingly hostile to and aggressive with the water protectors," and the officers used "violent tactics and munitions to deter and quell the protests." Doc. No. 1, ¶32. Mitchell alleges as the law enforcement presence grew, the militarized nature of these officials did as well. Doc. No. 1, ¶33. He further asserts "officers began using less-lethal weapons against water protectors without warning or notices to disperse." Doc. No. 1, ¶33.

[¶7]     For example, Mitchell asserts on October 22, 2016, Sheriff Kirchmeier commanded law enforcement officers to fire rubber bullets and spray pepper spray at protestors. Doc. No. 1, ¶35. On October 27, 2016, Mitchell maintains "hundreds of law enforcement officers wearing tactical riot gear and equipped with pepper spray, shotguns loaded with sponge bullets and bean bags, and other less-lethal weapons, arrived at a DAPL protest site in armored vehicles." Doc. No. 1, ¶36. He asserts officers deployed these weapons against protestors, causing injuries. Doc. No. 1, ¶36.

[¶8]     He also discusses a large-scale protest that took place on November 20, 2016 into the early morning on November 21, 2016. Doc. No. 37. At this protest, he states law enforcement, "acting under the direction and supervision of Defendant Kirhcmeier and the Morton County Sheriff's Office, indiscriminately deployed freezing water, chemical agents, and other less-lethal weapons, including lead-filled bean bags like the munitions [he] was harmed by, at individuals within the crowd." Doc. No. 1, ¶37. He asserts officers did this without providing adequate warnings or announcements. Doc. No. 1, ¶37. Many protestors, he states, suffered serious injuries. Doc. No. 1, ¶37.

[¶9]     Mitchell states, "throughout the fall of 2016 and the winter of 2017, Defendant Kirchmeier and the Morton County Sheriff's Office regularly equipped the law enforcement officers under their direction, supervision, and authority with less-lethal weapons, including bean bag guns." Doc. No. 1, ¶73. He further asserts many of these officers "lacked adequate training in the appropriate use of these less-lethal weapons" which "if deployed indiscriminately or inappropriately are dangerous; they can cause severe injuries, including death." Doc. No. 1, ¶¶73, 77. Mitchell claims numerous individuals were severely injured or died from being hit by bean bag pellets. Doc. No. 1, ¶83.

[¶10]     Mitchell contends Defendant Kirchmeier "defended law enforcement's use of force, and specifically the use of impact munitions, in response to the DAPL protests." Doc. No. 1, ¶39. Specifically, he alleges Defendant Kirchmeier stated "when we're put in the position of protected areas being overrun by numbers of people, these are lawful tools to quell the advancement." Doc. No. 1, ¶39. He also asserts Defendant Kirchmeier stated "we're not just gonna let people and protestors in large groups come in and threaten officers. That's not happening." Doc. No. 1, ¶39. Mitchell asserts officers "under the command of Defendant Kirchmeier and the Morton County Sheriff's Office maintained and engaged in these unconstitutional policies and practices of using excessive force throughout their response to the DAPL protests, including the protest where [he] was harmed in January 2017." Doc. No. 1, ¶41.

[¶11]     On January 18, 2017, and into the early morning of January 19, 2017, Mitchell states a protest involving around 200 protestors occurred. Doc. No. 1, ¶44. He maintains certain officers dispatched to the scene were issued 12-gauge shotguns that deployed drag stabilizing beanbag rounds. Doc. No. 1, ¶45, He identified these officers to include Bismarck Police Officer Josh Brown, Bismarck Police Officer Lane Masters, Defendant Bismarck Police Officer Tyler Welk, Bismarck Police Officer Damian Girodat, Morton County Sheriff's Deputy Cameron McClenahan, Defendant Morton County Sheriff's Deputy George Piehl, North Dakota Highway Patrol Trooper Scott Guenthner, and Defendant North Dakota Highway Patrol Sergeant Benjamin Kennelly. Doc. No. 1, ¶45. Mitchell maintains Defendant Kennelly was the scene commander, assigned the "Forward Command" position. Doc. No. 1, ¶46. In this position, Mitchell asserts, Defendant Kennelly "directed law enforcement officers during 'pushes', during which officers rushed, advanced toward and deployed munitions at the water protectors." Doc. No. 1, ¶46. He further

avers Defendant Kennelly was "at all times carrying out the policies of Defendant Kirchmeier and Morton County." Doc. No. 1, ¶47.

[¶12]     Mitchell contends he went to the Bridge in the late hours of January 18 when he heard "law enforcement officers were shooting unarmed water protectors, including elders and women[.]" Doc. No. 1, ¶48. Upon arrival, he observed that law enforcement "were indeed shooting people on the Bridge." Doc. No. 1, ¶49. He then "positioned himself in front of women and elders in the crowd" about 20 feet from the line of law enforcement officers. Doc. No. 1, ¶50.

[¶13]     Mitchell claims he was "unarmed and standing among other unarmed water protectors, generally keeping his hands raised above his head to make clear to the law enforcement officers that he was unarmed and peaceful." Doc. No. 1, ¶51. He states despite having his hands raised in the air, "[u]pon a countdown and without cause or justification, Defendant Morton County Sheriff's Deputy Piehl and Morton County Sheriff's Deputy John Doe 1 shot at [him] with a 12-gauge less-than-lethal shotgun loaded with drag stabilizing bean bag rounds." Doc. No. 1, ¶54. Mitchell asserts around the same time he was also shot with a beanbag round by Defendant Welk and Defendant Bismarck Police Department Officer John Doe 2. Doc. No. 1, ¶55. Mitchell alleges Defendant Kennelly did not intervene, instead "directed, encouraged, and/or facilitated the Defendant Officers' shooting of [him]." Doc. No. 1, ¶58. He explains the extent of his injuries including:

> [He] was hit in the face, leg, and in the back of his head by the Defendant Officers. A bean bag round shot by the Defendants Officers entered [his] left eye socket, shattering the orbital wall of his eye and his cheekbone, and ripping open a flap of skin nearly to his left ear. The bean bag round became lodged into his eye, with strands of the round protruding out of his left eye socket. After being shot, [he] became disoriented and fell face down to the ground, which was covered in snow. His nostrils filled with blood and he was unable to breathe, causing him to feel like he was drowning in his own blood.

Doc. No. 1, ¶¶56, 57, 59.

6

[¶14]    After the incident, Mitchell contends law enforcement officers immediately approached him and "pinned him to the ground, placing their knees on this body, and holding him down in the snow." Doc. No. 1, ¶60. He then claims officers handcuffed him "tightly behind his back and pulled him up and into a vehicle, as he was unable to get up on his own." Doc. No. 1, ¶60. In the vehicle, he asserts he could not see through the blood on his face, and an officer held him so tightly he was unable to breathe. Doc. No. 1, ¶ 61.  He was also allegedly denied water. Doc. No. 1, ¶61.

[¶15]    Mitchell was transported to Sanford Bismarck Medical Center by ambulance, accompanied by Morton County Sheriff's Deputies. Doc. No. 1, ¶62. When he arrived at the hospital, he fainted, waking up to find his left wrist and right leg were handcuffed to the hospital bed. Doc. No. 1, ¶62. Doctors advised him he had undergone surgery. Doc. No. 1, ¶63.

[¶16]    Mitchell alleges he was interrogated by two North Dakota law enforcement officers regarding the Oceti Sakowin camp while restrained to his hospital bed. Doc. No. 1, ¶64. The officers inquired about 'water protectors' upcoming plans and whether there were weapons present at the camp." Doc. No. 1, ¶64. Over the next day and a half, Mitchell asserts that, while he lay alone in his hospital bed, he learned "people were desperately searching for him, but could not find him, because law enforcement officers, in collusion with hospital staff, concealed his whereabouts." Doc. No. 1, ¶65.

[¶17]    Mitchell claims he was singled out that night by the Defendants as an "agitator" of the protests. Doc. No. 1, ¶52. He contends law enforcement identified certain individuals as "agitators," planning to arrest them "to particularly punish them, stop the protest, and chill the rights of other water protectors." Doc. No. 1, ¶52. On this basis, he asserts the Defendants planned to shoot and arrest him. Doc. No. 1, ¶52. Mitchell states this information is "documented in law enforcement reports." Doc. No. 1, ¶52.

[¶18]     In relation to the incident, Mitchell was charged by the State of North Dakota with criminal trespass and obstruction of a government function. Doc. No. 1, ¶68. Mitchell asserts law enforcement did not advise him of the charges while he was in the hospital, and a warrant was issued for his arrest. Doc. No. 1, ¶69. Mitchell concedes "the charges were ultimately resolved through a pretrial diversion agreement that resulted in the dismissal of the charges." Doc. No. 1, ¶70. He further contends, "[b]y bringing broad and ill-defined charges against [him], law enforcement unlawfully criminalized [his] right to defend indigenous sacred land and resources recognized in the [UNDRIP] and the United Nations Declaration on Human Rights Defenders." Doc. No. 1, ¶71.

[¶19]     In addition, Mitchell contends "[d]efendants have a history of discriminating against and racially profiling individuals in Indigenous communities." Doc. No. 1, ¶89. Mitchell claims the Defendants' closure of Highway 1806 had a substantial and disproportionate effect on the Standing Rock Sioux Tribe and tribal members. Doc. No. 1, ¶92. To support this assertion, Mitchell alleges John Floberg, an Episcopalian priest living at Standing Rock, has stated law enforcement officers patrol areas at times "when they know Native traffic is moving on the reservation, profiling for drunk driving, driving without a license or without insurance." Doc. No. 1, ¶89. Mitchell also states:

> Upon information and belief, during the early stage of the DAPL protests – from August 2016 to October 2016 – the Morton County Sheriff's Office assigned law enforcement officer to escort school buses filled with white children through areas where groups of Indigenous people were camped out, peacefully protesting, near a highway in North Dakota. These actions were intended to suggest to the white children that Indigenous people are dangerous.

Doc. No. 1, ¶90.

[¶20]     On these facts, Mitchell filed a Complaint in this matter on July 18, 2019, bringing twelve claims against the Defendants: Count I – Excessive Force (Fourth Amendment) (Defendants Piehl,

Welk, and John Does 1-2); Count II – Violation of Freedom of Speech and Association (Defendants Piehl, Welk, and John Does 1-2); Count III – First Amendment – Retaliatory Use of Force (Defendants Piehl, Welk, and John Does 1-2); Count IV – First Amendment – Retaliatory Arrest (Defendants Piehl, Welk, and John Does 1-2); Count V – Conspiracy to Deprive Mitchell of Civil Rights (All Individual Defendants); Count VI – Equal Protection (Defendants Piehl, Welk, and John Does 1-2); Count VII – Racially-Motivated Civil Conspiracy (All Individual Defendants); Count VIII – Failure to Intervene (Defendant Kennelly); IX – Unlawful Policy and Practice (Monell Claim) (Defendant Kirchmeier in Official Capacity); X – Intentional Infliction of Emotional Distress (Individual Defendants); Count XI – Respondeat Superior (Morton County and City of Bismarck); and XII – Indemnification (Morton County and City of Bismarck). Doc. No. 1.

## II.    LEGAL DISCUSSION

### 1.  Standard of Review

[¶21]    Rule 8(a)(2) of the Federal Rules of Civil Procedure provides that a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Rule 12(b)(6) of the Federal Rules of Civil Procedure mandates the dismissal of a claim if there has been a failure to state a claim upon which relief can be granted. When considering a motion to dismiss under Rule 12(b)(6), the court must accept all well-pleaded factual allegations in the Complaint as true. Schriener v. Quicken Loans, Inc., 774 F.3d 442, 444 (8th Cir. 2014). Detailed factual allegations are not necessary under the Rule 8 pleading standard, rather a plaintiff must set forth grounds of its entitlement to relief which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). A complaint does not "suffice if it tenders 'naked assertions'

devoid of 'further factual enhancement.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Twombly</u>, 550 U.S. at 557). The determination of whether a complaint states a claim upon which relief can be granted is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." <u>Id.</u> at 679. The court must consider whether the allegations set forth in the complaint "plausibly give rise to an entitlement to relief." <u>Id.</u> at 679. Dismissal will not be granted unless it appears beyond doubt the plaintiff can prove no set of facts entitling him or her to relief. <u>Ulrich v. Pope Cty.</u>, 715 F.3d 1054, 1058 (8th Cir. 2013).

[¶22]    "When considering . . . a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the court generally must ignore materials outside the pleadings, but it **may** consider some materials that are part of the public record or do not contradict the complaint, as well as materials that are necessarily embraced by the pleadings." <u>Miller v. Redwood Toxicology Lab., Inc.</u>, 688 F.3d 928, 931 (8th Cir. 2012) (emphasis added). Those materials include "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleadings." <u>Hughes v. City of Cedar Rapids, Iowa</u>, 840 F.3d 987, 998 (8th Cir. 2016). Courts may also consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned; without converting the motion into one for summary judgment." <u>Miller</u>, 688 F.3d at 931.

[¶23]    The Defendants request the Court to consider numerous extrinsic documents they provided in conjunction with their Motions to Dismiss and take judicial notice of a number of facts not contained in Mitchell's Complaint without converting their Motions to Dismiss into Motions for Summary Judgment. These extrinsic documents include an emergency declaration issued by Morton County, an Executive Order by former Governor Jack Dalrymple, numerous press releases

by law enforcement agencies, communications between government officials, warranty deeds, leases, and maps, among other documents. See Doc. No. 26-1 – 26-19. In addition, the Defendants urge the Court to take judicial notice of facts contained in separate orders issued by this District in other DAPL-related cases such as Dakota Access, LLC v. Archambault, et al, Case No. 1:16-cv-296, and Dundon et al v. Kirchmeier et al, Case No. 1:16-cv-406. The Defendants request the Court to take judicial notice of at least thirty-one facts embedded in some of these extrinsic documents.

[¶24]    While the Court could go through a detailed analysis of each of the extrinsic facts provided by the Defendants to determine if they are "embraced by the pleadings" or meet another exception for consideration at this stage of the proceedings, the Court finds it unnecessary to do so at this time. Even without considering these extrinsic documents, the Court finds the Plaintiff's claims fail to survive the Motion to Dismiss. The Court exercises its discretion in excluding for consideration any information not contained in Mitchell's Complaint, unless specifically noted and explained. Therefore, unless otherwise noted, the Court has considered only the facts on the face of Mitchell's Complaint.

    2.  Claims

        A.  Excessive Force (Count I)

[¶25]    "In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." Graham v. Connor, 490 U.S. 386, 394 (1989). "In most instances, that will be either the Fourth Amendment's prohibition against unreasonable seizures of the person, or the Eighth Amendment's ban on cruel and unusual punishments, which are the two primary sources of constitutional protection against physically abusive governmental conduct." Id. "The validity of

the claim must then be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard." Id. (citation omitted). Here, Mitchell's claim fits neatly within the Fourth Amendment analysis.

[¶26]    The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. Const. Amend. IV. "All claims that law enforcement officers have used excessive force . . . in the course of . . . [a] 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard.'" Id. at 395. In order to state a viable claim for excessive force under the Fourth Amendment, Mitchell must allege facts showing the Officers (1) seized him under the Fourth Amendment;  (2) this seizure was objectively unreasonable, and (3) the Officers are not entitled to qualified immunity. Atkinson v. City of Mountain View, Mo., 709 F.3d 1201, 1207 (8th Cir. 2013).

[¶27]    "When evaluating a Fourth Amendment excessive force claim under § 1983, [a court] consider[s] 'whether the amount of force used was objectively reasonable under the particular circumstances.'" Kohorst v. Smith, 968 F.3d 871, 876 (8th Cir. 2020) (citation omitted). The Court evaluates "the reasonableness of the force used from the perspective of a reasonable officer on the scene, not with the benefit of hindsight." Id. "This evaluation entails careful consideration of the case's particular facts and circumstances, including: '(1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." Id. (citing Graham, 490 U.S. at 396). The court may "also consider the result of the use of force." Id.

[¶28]    The Defendants argue Mitchell's Complaint fails to allege the officers used excessive force against him, and at most, the facts "only allege negligent application of less lethal force against him." Doc. No. 25, p. 30. Specifically, they argue his facts do not show the officers

"intended to shoot [him] in the eye or directed their fire at his head or upper body," further stating "[s]imply shooting at Plaintiff is not the same as intentionally shooting at Plaintiff's head." Doc. No. 25, p. 30. In their view, the fact that Mitchell "alleges he was at all times no less than 20 feet away from the police line and that upon a countdown, officers fired drag-stabilized bean bag rounds at him," fails to allege "his injuries were caused by anything more than a negligent application of less lethal force." Doc. No. 25, p. 30. On this basis, they assert the officers conduct is not actionable under § 1983. Doc. No. 25, p. 29 (citing <u>Roach v. City of Fredericktown, Mo.</u>, 882 F.2d 294, 297 (8th Cir. 1989)).

[¶29]    In the alterative, the Defendants argue even if Mitchell's facts allege more than negligent or grossly negligent conduct, the officers' conduct was still objectively reasonable. The Defendants argue Mitchell admits in his Complaint he observed law enforcement officers shooting at and applying force to other protestors before he made the decision to go to the Bridge. Doc. No. 25, p. 31. They contend Mitchell intentionally placed himself in "the forefront of the other protestors before the line of law enforcement officers, thereby engaging in obstruction of a government function." Doc. No. 25, p. 31. They also contend Mitchell was immediately apprehended at the scene after force was used. Doc. No. 25, p. 31. Therefore, they argue "it was objectively reasonable for law enforcement to apply less lethal drag stabilized bean bags to apprehend and arrest Plaintiff and to obtain compliance with the lawful commands of law enforcement relative to both Plaintiff and the other protestors on the scene." Doc. No. 25, p. 32.

[¶30]    Even if Mitchell was trespassing or obstructing a government function a fact finder could still conclude the officers used excessive force in arresting him or removing him from the scene. <u>See</u> <u>Ford v. Sanders</u>, No. 07-CV-00778, 2008 WL 442113, at *5 (E.D. Pa. Feb. 14, 2008) ("Although Ford's conviction for simple assault establishes defendants were justified in exerting

some force, the evidence varies on the level of force necessary."); <u>see also</u> <u>id.</u> ("A jury could find defendants used excessive force under the Fourth Amendment . . . even if Ford was not justified in his actions. To hold otherwise would imply an officer could constitutionally use excessive force against any person who committed an offense, no matter how inconsequential."). With this as a backdrop, the Court must determine if Mitchell has provided facts to suggest officers used excessive force during the incident in question, even in the event Mitchell was trespassing or obstructing a governmental function. The Court agrees with the Defendants that he has not provided sufficient facts.

[¶31]     The Court begins by recognizing Mitchell's description of the events that night and other protests leading up to it paint continuing chaos and tension between protestors and law enforcement. For example, he acknowledges the law enforcement presence significantly grew over the fall months of 2016. He discusses Sheriff Kirchmeier's request for assistance in responding to the DAPL protests from multiple agencies within North Dakota and surrounding states. He also admits 200 protestors were gathered on the Bridge the night of January 18, 2017. He discusses law enforcement officers doing "pushes" where they charged at protestors and deployed munitions. He concedes he witnessed law enforcement officers deploying munitions before he positioned himself in the exact line of fire. While Mitchell alleges everyone was peacefully protesting, the Court acknowledges law enforcement officers routinely and lawfully use less-lethal munitions to control crowds, even when individuals are peacefully protesting and are unlawfully in areas they are commanded to leave. <u>See</u> <u>Bernini v. City of St. Paul</u>, 665 F.3d 997 (8th Cir. 2012).

[¶32]     The Court likewise finds the officers were entitled to qualified immunity for their use of force. "Qualified immunity shields government officials from liability unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would know."

Ferguson v. Short, 840 F.3d 508, 510 (8th Cir. 2016). "The determination of whether qualified immunity is applicable in given circumstances is one of 'objective reasonableness.'" Herts v. Smith, 345 F.3d 581, 585 (8th Cir. 2003). The issue is not "whether the defendant acted wrongly, but whether reasonable persons would know they acted in a manner which deprived another of a known constitutional right." Id. (citing Sparr v. Ward, 306 F.3d 589, 593 (8th Cir. 2002)). The defendant bears the burden of proof on this affirmative defense. Id.

[¶33]    A two-step inquiry is undertaken to determine if qualified immunity is invoked: "(1) [whether] the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) [whether] the right was clearly established at the time of the deprivation." Jones v. McNeese, 675 F.3d 1158, 1161 (8th Cir. 2012). In this case, the Court concludes Mitchell has failed to plead a violation of his constitutional rights. However, even if Mitchell did plead viable constitutional violation claims, the Court concludes the officers would be entitled to qualified immunity because they did not violate clearly established law at the time of the incident.

[¶34]    "For the purposes of step two, "clearly established" means "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. While qualified immunity "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." White v. Pauly, 137 S. Ct. 548, 551 (2017) (citations omitted). "We . . . look to all available decisional law, including decisions from other courts, federal and state, when there is no binding precedent in this circuit." Meloy v. Bachmeier, 302 F.3d 845, 848 (8th Cir. 2002). "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning so

long as the unlawfulness is apparent." Dean v. Searcey, 893 F.3d 504, 518 (8th Cir. 2018), cert. denied, 139 S. Ct. 1291, 203 L. Ed. 2d 414 (2019).

[¶35]    The Court agrees with the Defendants that the law was clear at the time of the incident that using non-lethal munitions to direct crowds from closed areas was constitutional. The Defendants highlight the Eighth Circuit's finding in  Bernini, a protest case, wherein the Court noted "it was reasonable for the officers to deploy non-lethal munitions to keep all members of the crowd moving west [away from the closed area] even after they began to leave, because some protestors turned to face the police." Doc. No. 23, p. 19 (citing Bernini, 665 F.3d at 1006). Paralleling Bernini, the Defendants assert, and the Court agrees, Mitchell admits in his Complaint 200 individuals were present that night when officers were doing "pushes" and using less-lethal munitions against them. By his own admission, Mitchell states he placed himself in the line of fire rather than leaving the area. So, Mitchell was the cause of his own injury, not officers performing a legal duty. On these facts, an officer utilizing less-lethal force was appropriate, and the law at the time clearly established the same.

### B.    First Amendment Claims (Counts II-IV)

[¶36]   Mitchell pleads violations of his First Amendment rights on multiple grounds. He asserts in Count II, Defendants Piehl, Welk, and John Does 1-2 interfered "with his ability to associate freely in public and express his views as part of a peaceful demonstration." Doc. No. 1, ¶102. In Count III, he claims Defendants Piehl, Welk, and John Does 1-2 retaliated against him "for engaging in protected speech by subjecting him to excessive force without legal justification." Doc. No.1, ¶108. Finally, in Count IV, Mitchell avers Defendants Piehl, Welk, and John Does 1-2 retaliated against him "for engaging in protected speech by causing him to be arrested without probable cause." Doc. No. 1, ¶115.

[¶37]   The First Amendment provides that the government "shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for redress of grievances." It has long been made applicable to the states, and "its protections are at the core of our democratic society." Phelps-Roper v. City of Manchester, Mo., 697 F.3d 678, 686 (8th Cir. 2012) (citing Gitlow v. New York, 268 U.S. 652, 666, (1925)). However, "the fundamental right to speak secured by the First Amendment does not leave people at liberty to publicize their views 'whenever and however and wherever they please.'" Wood v. Moss, 572 U.S. 744, 757 (2014). Specifically, the First Amendment cannot be used as a justification for trespass. See Adderley v. State of Florida, 385 U.S. 39, 48 (1966); see also Weed v. Jenkins, No. 4:15CV140 RLW, 2016 WL 4420985, at *6 (E.D. Mo. Aug. 18, 2016), aff'd, 873 F.3d 1023 (8th Cir. 2017) ("The First Amendment does not entitle a citizen to trespass, block traffic, or create hazards for others.").

[¶38]   The Defendants assert Mitchell was trespassing at the time and place of the incident, and "therefore had no constitutional right to exercise his First Amendment rights of speech and assembly in the vicinity." Doc. No. 25, p. 22. Further, the Defendants maintain Mitchell entered into a pretrial diversion agreement with the State of North Dakota for the charges of criminal trespass and obstruction of a government function related to this exact incident. As a result, they assert his First Amendment claims are barred under Heck v. Humphrey. See Doc. Nos. 35, 36.

[¶39]   Mitchell counters, "[w]hether or not [he] was trespassing is a disputed fact which cannot be decided at this stage of the litigation." Doc. No. 31, p. 21. Mitchell asserts whether he "trespassed on January 19, 2017, at the moment he was shot is a genuine factual dispute." Doc. No. 31, p. 20. In addition, he argues that even if he was trespassing his retaliatory arrest claim

would survive under the <u>Nieves v. Bartlett</u>, 139 S.Ct. 1715, 1727 (2019) exception to the general rule that probable cause defeats a retaliatory arrest claim.

[¶40]    It is evident the survival of Mitchell's First Amendment claims hinge on whether law enforcement has probable cause Mitchell was trespassing and obstructing a governmental function at the time of the incident. As a preliminary matter, the Court must ascertain if the Defendants are correct that Mitchell's First Amendment claims are barred under <u>Heck v. Humphrey</u> due to the pretrial diversion agreement he entered with the State of North Dakota for the charges of criminal trespass and obstruction of a government function. The Court will also determine if Mitchell has pled facts to support each First Amendment claim in the event the claims are not barred under <u>Heck</u>.

### i.    Heck v. Humphrey

[¶41]    In this case, Mitchell has conceded in his Complaint he was charged by the State of North Dakota with criminal trespass and obstruction of a government function due to encounter with law enforcement officers on January 18-19, 2017. Doc. No. 1, ¶68. He notes the charges carried a maximum sentence of two years in prison and $6,000 in fines. Doc. No. 1, ¶68. While he contends these charges were "broad and ill-defined" he concedes "the charges were ultimately resolved through a pretrial diversion agreement that resulted in dismissal of the charges." Doc. No. 1, ¶¶70-71.

[¶42]    The Defendants assert "to whatever extent [Mitchell's] § 1983 action depends upon a claim that he was not trespassing on Backwater Bridge, his pretrial diversion agreement prevents him from re-litigating that issue because 'a judgement in favor of [Mitchell's §1983 action] would necessarily imply the invalidity of his [criminal trespass charge.]" Doc. No. 35, p. 2 (citing <u>Heck v. Humphrey</u>, 512 U.S. 477, 487 (1994)). The Defendants assert that "[b]y entering into the pretrial

diversion agreement in relation to the criminal trespass and obstruction of a government function charges, [he] has waived any claims, including § 1983 claims premised upon his not having committed those crimes as such claims would challenge the validity of the pretrial diversion agreement." Doc. No. 36, p. 5.

[¶43]   In Heck v. Humphrey, the United States Supreme Court held if a judgment from a federal district court on a § 1983 claim would "necessarily imply the invalidity" of the § 1983 plaintiff's state court conviction it must be dismissed unless the plaintiff can establish the conviction has been invalidated. "The purpose of the requirement, the Court explained, is to avoid parallel litigation of probable cause and guilt." Gilles v. Davis, 427 F.3d 197, 209 (3d Cir. 2005) (citing Heck, at 484). "It also prevents the claimant from succeeding in a tort action after having been convicted in the underlying criminal prosecution, which would run counter to the judicial policy against creating two conflicting resolutions arising from the same transaction." Id. One district court noted "it would constitute poor public policy to permit a criminal defendant to obtain lenient treatment by submitting to a benevolent program of this kind and then turn around and sue the arresting officer." S.E. v. Grant Cty. Bd. of Educ., 544 F.3d 633, 638 (6th Cir. 2008).

[¶44]   Specifically, the Supreme Court has outlined the parameters of the "Heck rule" to mean:

> in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.

Heck, 512 U.S. at 486-87.

[¶45]   Several circuits, including the Eighth Circuit, have coined this concept as the "favorable termination requirement." See Entzi v. Redmann, 485 F.3d 998, 1003 (8th Cir. 2007); Gilles v.

Davis, 427 F.3d 197, 208–12 (3d Cir. 2005); Randell v. Johnson, 227 F.3d 300, 301–02 (5th Cir. 2000) (per curiam); Figueroa v. Rivera, 147 F.3d 77, 80–82 (1st Cir.1998). This means a §1983 plaintiff must have achieved a favorable termination of a prior criminal charge before proceeding with a §1983 claim which may invalidate or impugn the plaintiff's prior criminal conviction or sentence, regardless of whether the plaintiff is incarcerated or not. See Newmy v. Johnson, 758 F.3d 1008, 1011-12 (8th Cir. 2014) ("[T]he Eighth Circuit—like the First, Third, and Fifth—has 'interpreted Heck to impose a universal favorable termination requirement on all § 1983 plaintiffs attacking the validity of their conviction or sentence.'"); see also Marlowe v. Fabian, 676 F.3d 676, 747 (8th Cir. 2012) (citing Entzi, 485 F.3d at 1003) ("The favorable termination requirement applies 'even when [the § 1983 plaintiff] is no longer incarcerated.'").

[¶46]    In the instance case, the Court must determine if Mitchell's entry into the pretrial diversion agreement with the State of North Dakota, which ultimately led to the dismissal of the charges, constitutes a "favorable termination." The Court will begin by looking at North Dakota law surrounding the purpose and structure behind pretrial diversion agreements.

[¶47]    Pursuant to North Dakota Rule of Criminal Procedure 32.2, pretrial diversion agreements are permitted under certain circumstances:

> After due consideration of the victim's views and subject to the court's approval, the prosecuting attorney and the defendant may agree that the prosecution will be suspended for a specified period after which it will be dismissed under Rule 32.2(f) on condition that the defendant not commit a felony, misdemeanor or infraction during the period. The agreement must be in writing and signed by the parties. It must state that the defendant waives the right to a speedy trial. It may include stipulations concerning the existence of specified facts or the admissibility into evidence of specified testimony, evidence, or depositions if the suspension of prosecution is terminated and there is a trial on the charge.

N.D. R. Crim. P. 32.2(a)(1).

[¶48]   The pretrial agreement may also contemplate other requirements on behalf of the defendant, including rehabilitation, restitution, and community service, among others. N.D. R. Crim. P. 32.2(a)(2). The North Dakota state court must approve of the additional conditions "after due consideration of the victim's views and ***upon a showing of substantial likelihood that a conviction could be obtained*** and that the benefits to society from rehabilitation outweigh any harm to society from suspending criminal prosecution." Id. (Emphasis added.) Under N.D. R. Crim. P. 32.2(f) the dismissal of the charges is effectuated when:

> If no motion by the prosecuting attorney to terminate the agreement is pending, the agreement is terminated and the complaint, indictment, or information must be dismissed by order of the court 60 days after expiration of the period of suspension specified by the agreement. If such a motion is then pending, the agreement is terminated and the complaint, indictment, or information must be dismissed by order of the court upon entry of a final order denying the motion. Following a dismissal under Rule 32.2(f) the defendant may not be further prosecuted for the offense involved.

N.D. R. Crim. P. 32.2(f).

[¶49]   The parties may also enter into a pre-charge diversion, wherein the defendant and prosecuting attorney may agree to divert "a case without court approval if charges are not pending before the court." N.D. R. Crim. P. 32.2(h). Pre-trial and pre-charge diversion agreements differ, however, from deferred impositions of sentence. In a deferred imposition of sentence, the defendant enters a guilty plea or is found guilty and 61 days after the expiration or termination of successful probation the case is dismissed and the file is sealed. N.D. R. Crim. P. 32.1. The explanatory notes to Rule 32.1 state "[a]n order deferring imposition of sentence is not a judgment," but "for purpose of appeal, an order deferring imposition of a sentence is equivalent to a judgment under N.D. R. Crim. P. 32(b)." N.D. R. Crim P. 32.1, note.

[¶50]   North Dakota caselaw and Eighth Circuit caselaw do not provide guidance on whether a pretrial diversion agreement is a favorable termination for purposes of Heck. Other courts,

however, have found agreements in this category do not constitute favorable terminations. For example, in Gilles v. Davis, the court found the plaintiff's participation in Pennsylvania's Accelerated Rehabilitative Disposition was not a favorable termination noting:

> The ARD program is a court-supervised compromise. Nevertheless, the ARD program imposes several burdens upon the criminal defendant not consistent with innocence, including a probationary term, restitution ... imposition of costs, and imposition of a reasonable charge relating to the expense of administering the program, and such other conditions as may be agreed to by the parties. We agree with Singleton [v. City of New York, 632 F.2d 185 (2d Cir. 1980)] that probation constitutes an "unfavorable" period of judicially imposed limitations on freedom in which the probationer's violation of the program's terms may result in criminal prosecution.

427 F.3d 197, 208-12 (3d Cir. 2005)(alteration added).

[¶51]   In Roesch v. Otarola, which predated Heck but applied the same prohibition on collateral attacks Heck would come to adopt, found plaintiff's participation in Connecticut's accelerated pretrial rehabilitation program was not a favorable termination noting:

> If we permit a criminal defendant to maintain a section 1983 action after taking advantage of accelerated rehabilitation, the program, intended to give first-time offenders a second chance, would become less desirable for the State to retain and less desirable for the courts to use because the savings in resources from dismissing the criminal proceeding would be consumed in resolving the constitutional claims. A person who thinks there is not even probable cause to believe he committed the crime with which he is charged must pursue the criminal case to an acquittal or an unqualified dismissal, or else waive his section 1983 claim.

980 F.2d 850, 853 (2d Cir. 1992).

[¶52]   The Court does not have before it the pretrial diversion agreement for Mitchell's underlying case or the terms of the agreement. However, the Defendants request the Court to take judicial notice of what appears to be the founding case wherein Mitchell was named a defendant and charged with criminal trespass and obstruction of a governmental function. Specifically, the Defendants request the Court to take judicial notice of documents embedded within the publicly accessible case State of North Dakota v. Andrew Nunez, No. 30-2017-CR-101. The Court may

take judicial notice of public records and those necessarily embraced by the pleadings. <u>Meiners v.</u>
<u>Wells Fargo & Co.</u>, 898 F.3d 820, 822 (8th Cir. 2018).

[¶53]   Certainly, Mitchell's pretrial diversion agreement would be embraced by the pleadings,
however, again, the Court does not have it before it. Nonetheless, Mitchell's concession he was
charged by the State of North Dakota with criminal trespass and obstruction of a government
function allows the Court to consider those public records wherein he is identified for these crimes
as they are necessarily embraced by his Complaint. Because Mitchell's First Amendment claims
are so intertwined with the question of whether there was probable cause he committed criminal
offenses at the time he was arrested, the Court will consider these public records.

[¶54]   On February 17, 2017, a Second Amended Complaint was filed against numerous
individuals, including Mitchell. 30-2017-CR-101, Index #15. In particular, the Second Amended
Complaint charges Mitchell with criminal trespass in violation of N.D.C.C. § 12.1-22-03.2(b),
stating "[k]nowing he/she is not licensed or privileged to do so, he/she enters or remains at any
place so enclosed as manifestly to exclude intruders; to-wit: At said time and place in Morton
County, the above-named defendants entered and remained on Backwater Bridge, at a time when
the bridge was closed, barricaded, posted, fenced, gated, and/or under surveillance." In addition,
the Complaint charges Mitchell with physical obstruction of a governmental function, namely that
"intentionally obstructing, impairing, impeding, hindering, preventing, or perverting the
administration of law or other governmental function; to-wit: At said time and place, the
Defendants obstructed law enforcement in its attempts to disperse the crowd and enforce law and
restore order at the Backwater Bridge." <u>Id.</u> at p. 2.

[¶55]   In addition, Officer Dion Bitz' affidavit to establish probable cause provides a more
detailed description of the events and the basis for the charges. Officer Bitz' affidavit states "[l]aw

enforcement responded to the backwater bridge due to approximately 175 protestors criminally trespassing on the bridge[.]" Doc. No. 1, p. 4. He also stated "[s]everal law enforcement officers gave verbal commands to the protestors to leave the bridge or they were subject to arrest for criminal trespass," further noting he "told the protestors they were trespassing and told them to go back to their camp." Doc. No. 1, p. 4. He ended the affidavit by stating "Markus [sp] Mitchell criminally trespassed and obstructed law enforcement by refusing to leave the bridge as described above." Doc. No. 1, p. 6. It appears Mitchell's case was assigned its own case number and the pretrial diversion agreement was executed in the separate, collateral case.

[¶56]   Even though the Court does not have Mitchell's exact agreement in front of it, it is evident the prosecuting attorney's agreement to dismiss the charges was qualified upon some action on behalf of Mitchell, most likely the agreement not to commit another crime within a certain amount of time. Otherwise, the dismissal of the charges likely would have been unqualified and dismissed outright. The Court agrees with the rationale from <u>Gilles</u> and <u>Roesch</u> that pretrial diversion agreements do not necessary equate acquittals. This is particularly true because Mitchell's pretrial diversion agreement was based upon some sort of qualification or qualifications. He was given the opportunity to divert prosecution if he abided by some requirement. There was a "judicially imposed limitation[] on [his] freedom in which [his] violation of the [agreement's] terms may result in criminal prosecution." <u>Gilles</u>, 427 F.3d at 212. He did not contest the charges to a trial or an acquittal, which would have resulted in an unqualified dismissal. Neither did he challenge in a pretrial motion the validity of the Court's finding of probable cause Mitchell committed the crimes as alleged, which also would have led to an unqualified dismissal. Instead, his dismissal was qualified upon an agreement to do or not do something. He now requests this Court ignore the state

24

court proceedings in order to allow him to bring claims in this Court. Heck is designed to prohibit this exact situation in which plaintiffs desire to have their cake and eat it too.

[¶57]    The issue then becomes whether Mitchell's success on his First Amendment claims would necessarily invalidate his disposition for criminal trespass and obstruction of a government function in his state-court proceedings. See Shultz v. Buchanan, 829 F.3d 943, 949 (8th Cir. 2016) (finding the plaintiff's Fourth Amendment claim against officer for unlawfully entering his home was not barred by Heck, noting" Success on Shultz's Fourth Amendment claim, however, would not demonstrate the invalidity of his conviction for public intoxication. All of the conduct relating to the public intoxication offense necessarily occurred in public and before Buchanan's entry into Shultz's home."). For Mitchell's First Amendment claims to be successful, it must be shown he had the right to exercise his First Amendment rights at the time and place in question. If the Court were to find in this case that he was lawfully exercising his rights when he was arrested, this would necessarily invalidate the state-law proceedings wherein officers had probable cause to charge him with trespass and obstruction of a government function for the same exact incident. On this basis, his claims are Heck-barred.

ii.    Merits

*(1) Freedom of Speech and Assembly*

[¶58]    Even if the Court were to find these claims were not barred under Heck, the Court finds they would still fail to state a claim for relief. Mitchell's Complaint asserts Defendants Morton County Sheriff's Deputy Piehl, Bismarck Police Officer Welk, Morton County Sheriff's Deputy John Doe 1, and Bismarck Police Officer John Doe 2 "violated [his] right[s] under the First Amendment to freedom of speech and freedom of assembly by interfering with his ability to

associate freely in public and express his views as part of a peaceful demonstration." Doc. No. 1, ¶102.

[¶59]   The Defendants contend Mitchell's First Amendment claim fails because he had no right to express his views, assemble, exercise his religious beliefs, or travel at any location at issue because it was closed. Doc. No. 25, p. 20. They assert because he was trespassing, he lost the protections of the First Amendment. The Court agrees. See Adderley v. State of Florida, 385 U.S. 39, 48 (1966) (finding the First Amendment cannot be used as a justification for trespass); see also Weed v. Jenkins, No. 4:15CV140 RLW, 2016 WL 4420985, at *6 (E.D. Mo. Aug. 18, 2016), aff'd, 873 F.3d 1023 (8th Cir. 2017) ("The First Amendment does not entitle a citizen to trespass, block traffic, or create hazards for others.").

[¶60]   Mitchell was aware law enforcement officers were utilizing "pushes" to get protestors away from certain areas. He conceded he witnessed law enforcement officers using force against other protestors, but he placed himself in the exact place the officers were attempting to remove individuals from. He admits he was charged with criminal trespass and obstruction of a government function. He admits he entered into an agreement with the State of North Dakota in order to get those charges ultimately dismissed, leading to a qualified dismissal.  In sum, Mitchell does not dispute that there was probable cause to find he committed the crimes of criminal trespass and interference with a government function at the time of the incident in question. Accordingly, the officers legitimately interfered with the Defendant's unprotected speech and unprotected assembly.

### (2) Retaliatory Use of Force and Retaliatory Arrest

[¶61]   Mitchell's Complaint asserts Defendants Morton County Sheriff's Deputy Piehl, Bismarck Police Officer Welk, Morton County Sheriff's Deputy John Doe 1, and Bismarck Police Officer

John Doe 2 "retaliated against [him] for engaging in protected speech by subjecting him to excessive force without legal justification." Doc. No. 1, ¶108. He asserts his "association with the water protectors and opposition to the DAPL were substantial and motivating factors for the Defendants' use of force against him." Doc. No. 1, ¶108. In addition, he maintains "Defendants' actions were intended to make Mr. Mitchell, who they identified as an agitator, and other people engaging in constitutionally protected speech and expression at the DAPL protests wary of continuing to engage in such protected activities in the future and specifically to chill their rights guaranteed under the First Amendment." Doc. No. 1, ¶108. As to retaliatory arrest, Mitchell contends "the Defendants retaliated against [him] for engaging in protected speech by causing him to be arrested without probable cause." Doc. No. 1, ¶115.

[¶62]    "It is well-settled that 'as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . on the basis of his constitutionally protected speech.' Osborne v. Grussing, 477 F.3d 1002, 1005 (8th Cir. 2007). To establish a § 1983 claim for retaliation in violation of the First Amendment, a plaintiff must allege (1) that he engaged in a protected activity, (2) that the defendants responded with adverse action that would "chill a person of ordinary from continuing in the activity," and (3) that "the adverse action was motivated at least in part by the exercise of the protected activity." L.L. Nelson Enterprises, Inc. v. Cty. of St. Louis, Mo., 673 F.3d 799, 807–08 (8th Cir. 2012). For retaliatory arrest claims, the plaintiff must also show "the lack of probable cause or arguable probable cause." Graham v. Barnette, 970 F.3d 1075, 1091 (8th Cir. 2020) (quoting Hoyland v. McMenomy, 869 F.3d 644, 655 (8th Cir. 2017)).

[¶63]    "The ordinary-firmness test is well established in the case law and is designed to weed out trivial matters from those deserving the time of the courts as real and substantial violations of

the First Amendment." <u>Garcia v. City of Trenton</u>, 348 F.3d 726, 728 (8th Cir. 2003). "The test is an objective one, not subjective." <u>Id.</u> "The question is not whether the plaintiff herself was deterred, though how plaintiff acted might be evidence of what a reasonable person would have done." <u>Id.</u> "When applying the ordinary firmness test, courts should be 'mindful' that the 'effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable.'" <u>Taylor v. Haugaard</u>, 360 F. Supp. 3d 923, 931 (D.S.D. 2019).

[¶64]    Plaintiffs must additionally prove causation. "To prevail in an action for First Amendment retaliation, 'plaintiff must show a causal connection between a defendant's retaliatory animus and [plaintiff's] subsequent injury.'" <u>Baribeau v. City of Minneapolis</u>, 596 F.3d 465, 481 (8th Cir. 2010). "Retaliation need not have been the sole motive, but it must have been a 'substantial factor' in" the decision[.]" <u>Id.</u> "Furthermore, the plaintiff must show that the retaliatory motive was a but-for cause of the harm; that is, that the plaintiff was "singled out" for adverse treatment because of his exercise of constitutional rights." <u>Kilpatrick v. King</u>, 499 F.3d 759, 767 (8th Cir. 2007).

[¶65]    The parties disagree on whether the use of force and arrest were motivated at least in part by the exercise of the protected activity. Mitchell contends his allegations "make clear that the Defendants shot [him] because they wanted to punish him for protesting and stop others from protesting." Doc. No. 31, p. 22. The Defendants contend "it was Plaintiffs' unlawful conduct of trespass and obstruction of a government function which motivated the use of force against him and his arrest, not the content of his speech." Doc. No. 25, p. 23. Again, Mitchell counters that whether he was trespassing is disputed, and states "the facts as alleged in the complaint plausibly

suggest that the officers had no probable cause to arrest him and his protected speech was the but-for cause of his arrest." Doc. No. 31, p. 23.

[¶66]    Apparently Mitchell believes that by simply stating there was no probable cause for trespass and obstruction of a government function none existed. The record is contrary to this assertion. Mitchell had the opportunity to contest the probable cause findings by the state court that he was trespassing and obstructing a government function at the time of the incident in question, but he chose not to. Instead, he entered into a qualified agreement with the State of North Dakota to avoid prosecution. Rule 32.2(a)(2), N.D.R.Crim.P., provides the state court may only approve such an agreement upon a showing of substantial likelihood that a conviction could be obtained.  The record, therefore, establishes legitimate reasons unrelated to the exercise of Mitchell's First Amendment rights that justified his arrest and the use of force.

[¶67]   Mitchell has therefore failed to provide facts to create the causal link that he was singled out for adverse treatment *because of* his exercise of constitutional rights. Mitchell admits in his Complaint he was charged with criminal trespass and obstruction of a governmental function. He admits 200 individuals were on the Bridge that night, and he concedes he was aware of the fact that law enforcement officers were in a uniform line performing "pushes" to move individuals back from the line, yelling countdowns, and using crowd-control tactics against other individuals. Mitchell concedes he placed himself in front of the other individuals. Additionally, Officer Bitz' affidavit again states "law enforcement officers gave verbal commands to the protestors to leave the bridge or they were subject to arrest," noting he specifically "told the protestors they were trespassing and told them to go back to their camp." 30-2017-CR-101-, Doc. No. 1, p. 4. Again, Mitchell was included in these "protestors."

[¶68]   Law enforcement officers at least had arguable probable cause to arrest Mitchell for trespass and obstruction of a government function, a finding Mitchell had the opportunity to contest at the state-level but instead chose to abandon when he entered into a diversion agreement. Mitchell has not sufficiently shown he was arrested and subjected to police force for the content of his speech, but rather the facts suggest it was for failing to comply with law enforcement orders. Therefore, his retaliation claims based upon force and arrest both fail. See Weed v. Jenkins, No. 4:15CV140 RLW, 2016 WL 4420985, at *8 (E.D. Mo. Aug. 18, 2016), aff'd, 873 F.3d 1023 (8th Cir. 2017) ("Here, however, Plaintiff was arrested not for sharing his political views but for refusing to obey an officer's order related to the traffic safety.").

[¶69]   In addition, Mitchell asserts even if he was trespassing, "it would not be fatal to his retaliatory arrest claim." Doc. No. 31, p. 25. He argues he could "still be engaged in constitutionally protected First Amendment activity even if he acted unlawfully." Doc. No. 31, p. 20 (citing Nieves v. Bartlett, 139 S.Ct. 1715, 1727 (2019)). The Court disagrees Mitchell has provided enough facts to support the Nieves exception.

[¶70]   "[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." Nieves v. Bartlett, 139 S. Ct. 1715, 1722, 204 L. Ed. 2d 1 (2019). "If an official takes adverse action against someone based on that forbidden motive, and 'non-retaliatory grounds are in fact insufficient to provoke the adverse consequences,' the injured person may generally seek relief by bringing a First Amendment claim." Id. In retaliatory arrest cases, however, "it is particularly difficult to determine whether the adverse government action was caused by the officer's malice or the plaintiff's potentially criminal conduct." Id. at 1724. Generally, a showing of probable cause for the criminal conduct will defeat a retaliatory arrest claim. Id. at 1727. However, the Supreme Court recognized a narrow exception

"is warranted for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." Id. at 1727. In order to invoke the Nieves exception, Mitchell must present "objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." Id. at 1727.

[¶71]   Mitchell contends, "[t]he question becomes whether North Dakota law enforcement generally arrests people who are not water protectors for trespassing, or whether they generally arrest people who are not protesting heated political issues for trespassing." Doc. No. 31, p. 25. He argues discovery is needed to answer this question, but even at this stage, the Court can "infer from [his] allegations that he would not have been arrested for trespassing if he were not a water protector and that the officers 'exploit[ed] the arrest power as a means of suppressing speech." Doc. No. 31, p. 25. Mitchell has failed to offer any facts to make this inference. This is a threshold showing, and without objective evidence to support it, the Court will not recognize a Nieves exception in this instance. See Nieves, 139 S.Ct. at 1727 ("After making the required showing, the plaintiff's claim may proceed in the same manner as claims where the plaintiff has met the threshold showing of the absence of probable cause."). Mitchell simply has not shown that law enforcement in North Dakota do not arrest individuals for trespassing during a tumultuous protest that frequently devolved into violence. Mitchell asks this Court to conclude North Dakota law enforcement only does its job when persons are asserting a constitutional right—a conclusion that is so absurd it is not worth consideration. Without such a showing, Mitchell cannot be afforded the benefits under Nieves.

[¶72]   Furthermore, the Court agrees with the Defendants that even if it did find Mitchell properly invoked the Nieves exception, the officers would be entitled to qualified immunity on the same. The Nieves case was handed down in 2019, years after the incident in question, so it was not

"clearly established" at the time of the alleged constitutional violation. See Novak v. City of Parma, 932 F.3d 421, 430 (6th Cir. 2019) ("Though Nieves also created an exception to that general rule . . . the exception does not apply here because the officers would not have been aware of it at the time of Novak's arrest since the case was decided later."); see also Sellers By & Through Sellers v. Baer, 28 F.3d 895, 900 (8th Cir. 1994) ("The issue in this case for purposes of qualified immunity is whether reasonable officers in the position of Vecera, Bridges, Burnett, and King would have understood they were violating Deuser's constitutional rights[.]").

### C.     Equal Protection (Count VI)

[¶73]   Mitchell lodges an equal protection violation claim against Defendants Morton County Sheriff's Deputy Piehl, Bismarck Police Officer Welk, Morton County Sheriff's Deputy John Doe 1, and Bismarck Police Officer John Doe 2. Doc. No. 1, ¶128. Mitchell asserts "the Defendants intentionally discriminated against [him] on the basis of his status as an Indigenous person and his political and religious beliefs in opposition to DAPL[.]" Doc. No. 1, ¶129. He alleges "the Defendants acted upon discriminatory animus when they targeted him for arrest and used excessive force against him to quell his First Amendment rights." Doc. No. 1, ¶130.

[¶74]   "The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits a state from denying 'to any person within its jurisdiction the equal protection of the laws.'" Walker v. Hartford Life & Accident Ins. Co., 831 F.3d 968, 976 (8th Cir. 2016) (citing U.S. Const. amend. XIV, § 1). "The purpose of the[se] equal protection clause[s] ... is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination." Id. (quoting Sunday Lake Iron Co. v. Township of Wakefield, 247 U.S. 350, 352 (1918)). "The Equal Protection Clause generally requires the government to treat similarly situated people alike." Klinger v. Dep't of Corr., 31 F.3d 727, 731 (8th Cir. 1994). "Dissimilar treatment

of dissimilarly situated persons does not violate equal protection." Id. "Thus, the first step in an equal protection case is determining whether the plaintiff has demonstrated that [he] was treated differently than others who were similarly situated to [him]." Id. "Absent a threshold showing that [he] is similarly situated to those who allegedly receive favorable treatment, the plaintiff does not have a viable equal protection claim." Id.

[¶75]    In this case, the Defendants assert Mitchell has failed to "allege all of the other individuals against which force was applied were also Indigenous persons or shared Plaintiff's religious beliefs." Doc. No. 25, p. 25. They further argue, Mitchell fails to "allege force was not applied to persons of other races or religious beliefs who were also engaging in trespass or obstructing a government function." Doc. No. 25, p. 25. The Defendants also aver Mitchell describes "the water protectors as simply other concerned individuals who opposed DAPL." Doc. No. 25, p. 25.

[¶76]    Mitchell counters that even though he did not identify a "specific comparator to show he was treated differently from others similarly situated," "given the historical context of discriminatory policing by the Morton County Sheriff's Office, it is plausible to infer that the Defendants used excessive force and arrested Plaintiff for protesting because of his race and religious and political views." Doc. No. 31, p. 29. Citing to the Seventh Circuit, Mitchell argues his Complaint does not need to specify a comparator. Doc. No. 31, p. 29 (citing Geinosky v. City of Chicago, 675 F.3d 743, 748 n.3 (7th Cir. 2012)).[2] This Court disagrees with Mitchell on both fronts and finds he has failed to allege facts to support an equal protection claim.

---

[2] The Geinosky Court stated the reason the plaintiff was not required to show a specific comparator was because "the alleged facts so clearly suggest harassment by public officials that has no conceivable legitimate purpose," so as to support the plaintiff's class-of-one equal protection claim founded upon his allegations of receiving twenty-four parking tickets by the same police unit.

[¶77]   First, the Eighth Circuit, and courts operating within it, consistently apply Klinger's threshold requirement that a plaintiff must show a comparator within the Complaint at the motion to dismiss stage. See In re Kemp, 894 F.3d 900, 909 (8th Cir. 2018), cert. denied sub nom. Griffen v. Kemp, 139 S. Ct. 1176, 203 L. Ed. 2d 199 (2019); ARRM v. Piper, 367 F. Supp. 3d 944, 958 (D. Minn. 2019); HCI Distribution, Inc. v. Peterson, 360 F. Supp. 3d 910, 922 (D. Neb. 2018). The Court will do the same here in determining if Mitchell has demonstrated that he was treated differently than others who were similarly situated to him.

[¶78]   By Mitchell's own version of events, there were 200 people on the Bridge on the evening of the protest. He admits law enforcement officers were allegedly using munitions on protestors even before he arrived at the Bridge and could witness the same. Furthermore, he does not signify that the only people who were hit with munitions were also Indigenous or shared his religious beliefs. He also does not allege force was *not* applied to persons of other races or religious beliefs. The Court agrees with the Defendants that his "allegation or implication the 'water protectors' shared the political goal of preventing completion of DAPL, even if true, does not allege a suspect classification by law enforcement." Doc. No. 25, p. 25.

[¶79]   Mitchell also asks the Court to infer that law enforcement treated him differently than others similarly situated based upon the "historical context of discriminatory policing by the Morton County Sheriff's Office." Doc. No. 31, p. 28-29. He asserts the Court should infer "the comparator here is not other Indigenous water protectors, as Defendants would suggest, but rather people who are not Indigenous (i.e. white) that protest other issues." Doc. No. 31, p. 39.  On this basis, he alleges this "historical context" supports an inference that "if he had not been an Indigenous water protector – and instead was a white man protesting generally – he would not

[have been] arrested so violently." Doc. No. 31, p. 39. The Court declines the invitation to make these inferences based on a mere slander contained in a pleading.

[¶80]   Mitchell makes five general statements to support his allegation that "Defendants have a history of discriminating against and racially profiling individuals in Indigenous communities." Doc. No. 1, ¶89. First, he asserts an untitled article states "many Native Americans say they feel [contempt] from North Dakotans and particularly from police." Doc. No. 1, ¶89. Second, he asserts a priest who has lived on the Standing Rock Reservation states he believes the Morton County Sheriff's Office racially profiles by targeting Native traffic. Doc. No. 1, ¶90. Third, he maintains that during August to October of 2016 the Morton County Sheriff's Office allegedly escorted school busses of white children to the protest areas to show them "Indigenous people are dangerous." Doc. No. 1, ¶90. Fourth, he asserts "the effect and intent" of officials in closing Highway 1806 from Fort Rice to Fort Yates on October 24, 2016, "was to punish, retaliate, discriminate against, and severely burden residents of the neighboring reservation." Doc. No. 1, ¶92. Fifth, he asserts the road closure "substantially and disproportionately impacted the Standing Rock Sioux Tribe and tribal members." Doc. No. 1, ¶92.

[¶81]   Even if any of these allegations were proven true, they would not support a finding that on the night of January 18, 2017, law enforcement officers did not use munitions or otherwise use force against individuals who were not Indigenous or those who may not share Mitchell's religious beliefs. In other words, Mitchell only provides speculation as to his equal protection claims. Mitchell himself asserts munitions were being used before he even arrived at the Bridge. Law enforcement could have very well used munitions on non-Indigenous individuals with completely different religious views than Mitchell. To ask the Court to find law enforcement would not have used the same level of force on a white individual protesting a different issue is asking the Court

to compare apples to oranges, which is why equal protection violations are confined to comparison to similarly-situated individuals. "[A]n equal protection violation cannot be founded on theoretical possibilities." Walker v. Nelson, 863 F. Supp. 1059, 1065 (D. Neb. 1994), aff'd in part, 70 F.3d 1276 (8th Cir. 1995).

[¶82]   Furthermore, if Mitchell requests the Court to consider the history of Morton County's interactions with Indigenous and non-Indigenous individuals, the Court will also consider Mitchell's own descriptions of past events with other protestors. Specifically, Mitchell asserts law enforcement allegedly used force against Sophia Wilansky on November 21, 2016. Doc. No. 1, ¶38. Mitchell makes no mention of Wilansky's racial background, but if she were to identify as non-Indigenous, this would further weaken Mitchell's argument that only Indigenous individuals were targeted by law enforcement. Again, Mitchell provides speculation.

[¶83]   In addition, Mitchell asks for the Court to conclude law enforcement officers allegedly interacted with him the way they did because of his particular race, Mitchell himself alerts the Court to the fact that he was charged with trespassing and obstruction of a government function related to the exact incident. Although he contends he entered a pretrial diversion program that eventually resulted in dismissal of the charges, there (clearly by his own acknowledgement) existed plausible reasons for his arrest outside of the context of race.

### D.    Conspiracy Claims (Counts V, VII)

[¶84]   Mitchell lodges two conspiracy claims against Defendants Morton County Sheriff Kirchmeier, Morton County Sheriff's Deputy Piehl, Bismarck Police Officer Welk, North Dakota Highway Patrol Sergeant Kennelly, Morton County Sheriff's Deputy John Doe 1, and Bismarck Police Officer John Doe 2. Doc. No. 1, ¶¶120, 133. Count V alleges the Defendants conspired to

deprive Mitchell of his Civil Rights and Count VII alleges the Defendants engaged in a racially motivated conspiracy. Doc. No. 1, pp. 26, 28.

[¶85]   "To prove a § 1983 conspiracy claim, [the plaintiff] must prove: (1) that the defendants conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured him." Holmes v. Slay, 895 F.3d 993, 1001 (8th Cir. 2018) (citing Bonenberger v. St. Louis. Metro. Police Dep't, 810 F.3d 1103, 1109 (8th Cir. 2016)). "[T]he plaintiff must allege with particularity and specifically demonstrate with material facts that the defendants reached an agreement." Id. However, "[t]he plaintiff can satisfy this burden by pointing to at least some facts [that] would suggest the defendants reached an understanding to violate his rights." Id. "Evidence of 'an agreement to deprive [a] plaintiff of constitutionally guaranteed rights' typically is circumstantial." Livers v. Schenck, 700 F.3d 340, 361 (8th Cir. 2012) (citing White, 519 F.3d at 816). Moreover, "the plaintiff is additionally required to prove a deprivation of a constitutional right or privilege in order to prevail on a § 1983 civil conspiracy claim." Kingsley v. Lawrence Cty., Missouri, 964 F.3d 690, 702 (8th Cir. 2020).

### i.  Racially-Motivated Conspiracy Claim (Count VII)

[¶86]   The Court will begin with Mitchell's racially-motivated conspiracy claim against the Defendants (Count VII). Mitchell asserts in his Complaint "[t]he purpose of this conspiracy was to deprive of equal protection of the laws, as guaranteed to them by the Fourteenth Amendment and the International Covenant on Civil and Political Rights and the United Nations Declaration on the Rights of Indigenous Peoples, those Indigenous citizens who engaged in protest and to deny them the privileges and immunities of liberty and the right to petition the government for the redress of grievances." Doc. No. 1, ¶135. He avers the Defendants "conspired with racial animus

toward [him] and other Indigenous people who were protesting the DAPL to use excessive force

to quell their speech," further asserting, "[t]he conspiratorial agreement was effectuated as part of

a long-standing pattern of racially-discriminatory and racially targeted policing in Morton

County." Doc. No. 1, ¶136.

[¶87]    As noted above, the Court finds Mitchell has failed to plead a claim that officers violated

his equal protection rights, and because his racially-motivated conspiracy claim rides on the

survival of the equal protection claim, his racially-motivated conspiracy claim suffers a similar

fate. See Deutsche Fin. Servs. Corp. v. BCS Ins. Co., 299 F.3d 692, 700 (8th Cir. 2002) ("[A

Plaintiff] cannot prevail on its claim for civil conspiracy where the underlying tort claim fails.");

see also Cenveo Corp. v. S. Graphic Sys., Inc., 784 F. Supp. 2d 1130, 1136 (D. Minn. 2011) ("a

civil conspiracy claim is merely a vehicle for asserting vicarious or joint and several liability, and

hence such a 'claim' is dependent upon a valid underlying tort claim."). It is Mitchell's burden to

allege facts to support a finding the Defendants' alleged wrongful actions were racially-motivated

so as to deny him equal protection of the law.

[¶88]    As discussed above, the Court has found Mitchell failed to allege sufficient facts to support

a finding of disparate treatment justifying a claim for an equal protection violation. On this ground

alone, his claim for racially-motivated conspiracy to violate his equal protection rights fails.

Nevertheless, he has also failed to allege sufficient facts to support a racially-motivated conspiracy

claim. Again, Mitchell fails to provide any facts to support a finding that the disparate treatment

he alleges he and others received by these law enforcement officers the night of January 18, 2017

was based on race. In light of the entire factual outline of the Complaint, Mitchell's conclusory

statement that "he was targeted because of his race and religious and political beliefs," is wholly

insufficient to support a finding that these Defendants entered into a racially-motivated conspiracy

to deprive him of his equal protection rights. His request that the Court should impute a finding that these specific officers' actions were racially-motivated based his allegations that Morton County has a "history of racially profiling" is also inappropriate and unsupported by any actual record.

[¶89]    Mitchell has likewise failed to put forth facts showing there was a meeting of the minds of *these* law enforcement officers to deprive him of his equal protection rights. Instead, Mitchell alone provides the Court with a non-race-based reason for his possible treatment by law enforcement: he was charged with criminal trespass and obstruction of a government function for the incident in question. While he contends this arrest was pre-planned by law enforcement because of their label of him as an "agitator," he fails to adduce facts to suggest there was a meeting of the minds by each of the named Defendants that this was based upon his race.

ii.    Conspiracy to Violate Civil Rights (Count V)

[¶90]    Count V alleges the Defendants entered into a conspiracy to violate his civil rights. In this conspiracy claim, Mitchell asserts "[e]ach of the Defendants took concrete steps to enter into an agreement in January 2017 to unlawfully use force to quell the constitutionally protected activities of individuals participating in the DAPL protests, including Mr. Mitchell, knowing they lacked legal justification to do so, and for the purpose of violating Plaintiff's Fourth Amendment rights as well as his First Amendment rights to protest by engaging in non-disruptive speech in support of an issue of pressing public importance." Doc. No. 1, ¶122. He further contends, "[i]n furtherance of this conspiracy, each of the Defendants committed specific overt acts, misusing their police powers for the purpose of violating Mr. Mitchell's rights and unlawfully silencing him." Doc. No. 1, ¶123. He alleges, "they accomplished this goal using excessive force by shooting bean bag

pellets at him to prevent Mr. Mitchell from continuing to peacefully protest the construction of the DAPL." Doc. No. 1, ¶123.

[¶91]   The Defendants argue the facts are conclusory in nature and are insufficient to show the defendants had a "meeting of the minds" to violate his civil rights. Specifically, the Defendants assert that   "[p]lanning to arrest an individual committing a crime does not, in and of itself, establish a violation of constitutional rights or a conspiracy to do so." Doc. No. 35, p. 7. They further argue "[b]eing issued a shotgun that employs less-than-lethal munitions does not, in and of itself, establish a violation of constitutional rights or a conspiracy to do so." Doc. No. 35, p. 8. Defendant Kennelly specifically asserts "[b]eing a scene commander of other law enforcement officers does not, in an of itself, establish a violation of constitutional rights or a conspiracy to do so." Doc. No. 35, pp. 7-8.

[¶92]   To support the survival of his conspiracy claims, Mitchell argues he has plead the following facts:

> First, Plaintiff alleges that Defendants Peihl, Welk, and Kennelly were all dispatched to the scene with 12 gauge shotguns. Plaintiff alleges that these Defendants singled him out as an "agitator" and made a plan to shoot and arrest him at Backwater Bridge in order to punish him, stop the protest, and chill the rights of other water protectors. This plan was documented in law enforcement reports following the shooting. Plaintiff alleges that he was targeted because of his race and religious and political beliefs. These facts, taken as true, demonstrate a meeting of the minds on the part of these Defendants to deprive Plaintiff of his rights. Second, Plaintiff alleges that Defendants Piehl and Welk, upon a countdown, committed the overt act of shooting Plaintiff in furtherance of the conspiracy. Third, Plaintiff alleges that as a result of being shot, he suffered severe physical and mental injury.

Doc. No. 31, p. 31.

[¶93]   Mitchell further argues it was not just the officers' presence at the Bridge that night that lends credence to his conspiracy claims. Instead, he argues "Defendant Kennelly was the commander of the scene that evening and made a plan with the other officers dispatched to the

scene to shoot and arrest [him], who he and the other officers deemed to be an 'agitator.'" Doc. No. 31, p. 33. He maintains he has alleged "specific facts that the Defendants targeted [him] because of his race and religious and political beliefs, made a plan to shoot and arrest him to punish him and quell the rights of other water protectors, and executed that plan." Doc. No. 31, p. 33. As an initial matter and as discussed above, the Court has found the Defendants did not engage in excessive force in violation of the Fourth Amendment. Since there is no Fourth Amendment violation alleged, the conspiracy claim necessarily fails. It is not unconstitutional to conspire to not violate another's constitutional rights. Even assuming for the moment an excessive force claim has been adequately pled, the Court agrees with the Defendants that Mitchell has failed to "allege with particularity and specifically demonstrate with material facts that the defendants reached an agreement." City of Omaha, 883 F.2d at 652.

[¶94]   Besides all Defendants being present at the Bridge at the time of the incident in question, the only other facts proffered by Mitchell to show an agreement between the specific Defendants are a vague statement that "the Defendants made a plan to shoot and arrest [him] at Backwater Bridge, despite the fact that [he] was peacefully protesting" and an allegation that law enforcement reports document the Defendants' singled out certain water protectors as "agitators" in order to "punish them, stop the protest, and chill the rights of other water protectors." Doc. No. 1, ¶52. Mitchell fails to provide even a scintilla of evidence regarding the alleged plan, including when it was made, what was communicated and by whom. He simply, nakedly avers there are law enforcement reports outlining the same.

[¶95]   Mitchell asks the Court to ignore the fact that officers charged him with obstructing a government function and criminal trespass. Again, Mitchell entered into an agreement with the State of North Dakota to do or not do something in order to get these charges qualifiedly dismissed.

41

Mitchell admits law enforcement officers were using force upon numerous other individuals that night. He has failed to adduce facts to show these officers conspired to violate his civil rights by using force and arresting him only because of his race, political beliefs, or otherwise.

E.    Failure to Intervene (Count VIII)

[¶96]   Mitchell asserts a failure to intervene claim against Defendant Kennelly. Specifically, he asserts "Defendant Kennelly had the opportunity and the duty to intervene on behalf of [him] and prevent the constitutional violations described [throughout], but declined or refused to do so. Doc. No. 1, ¶142. The Defendants assert Mitchell's Complaint lacks sufficient facts to support a failure to intervene claim. The Court agrees.

[¶97]   It is "clearly established that an officer who fails to intervene to prevent the unconstitutional use of excessive force by another officer may be held liable for violating the Fourth Amendment." Grider v. Bowling, 785 F.3d 1248, 1253 (8th Cir. 2015). However, "[the] duty of a police officer to intervene to prevent the excessive use of force [exists] where the officer is aware of the abuse and the duration of the episode is sufficient to permit an inference of tacit collaboration." Krout v. Goemmer, 583 F.3d 557, 565 (8th Cir. 2009) "A police officer who *fails* to act to prevent the use of excessive force may still be held liable where (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." Nance v. Sammis, 586 F.3d 604, 612 (8th Cir. 2009) (citing Floyd v. City of Detroit, 518 F.3d 398, 406 (6th Cir. 2008)).

[¶98]   Because the Court has found the Complaint insufficiently alleges an excessive force claim, Mitchell's claim for failure to intervene necessarily fails. Nevertheless, the Complaint also fails to establish Defendant Kennelly observed or had reason to know of the purported excessive force and that Defendant Kennelly has the opportunity and means to prevent the alleged harm from

occurring. Mitchell's Complaint alleges Defendant Kennelly was "dispatched to the scene," and acted as the "scene commander." Doc. No. 1, ¶45. Mitchell makes no mention, however, of Defendant Kennelly's location when the other officers were allegedly shooting him with bean bag rounds. Instead, in conclusory fashion, he states "Defendant Kennelly had the duty and opportunity to intervene on [his] behalf, but did nothing to assist him, and in fact directed, encouraged, and/or facilitated the Defendant Officers' shooting of [him]." Doc. No. 1, ¶58. The Court rejects this legal conclusion because Mitchell's Complaint fails to provide facts to substantiate it.

[¶99]   He does not allege a single fact to show Defendant Kennelly was in close proximity to the officers to observe what was happening nor does he allege any facts to show Defendant Kennelly had reason to know the officers were allegedly using the bean bag rounds improperly. Merely alleging he was the scene commander and he and the officers were legally issued weapons that deploy bean bag rounds does not mean he had a reason to believe the officers were deploying them in an inappropriate manner. Additionally, Mitchell fails to allege a single fact to support the notion that Defendant Kennelly was in such a position that he had the opportunity and means to intervene. His conclusory statements that Defendant Kennelly was involved in a conspiracy have also failed above.

F.    Monell Claims (Count IX)

[¶100]   Mitchell asserts Monell claims against Sheriff Kirchmeier in his official capacity. First, he asserts "[t]he Defendants, acted under the color of law, and under the authority of one or more interrelated de facto policies, practices, and/or customs of the Morton County Sheriff's Office, to violate [his] rights[.]" Doc. No. 1, ¶146. He alleges Sheriff Kirchmeier, as the final policymaker for the law enforcement response to the DAPL protests, "developed and maintained policies, practices, procedures, and customs of using excessive force and discriminatory policing against

the water protectors[.]" Doc. No. 1, ¶148. He further asserts Sheriff Kirchmeier "led and commanded other law enforcement agencies under his control to engage in the same, exhibiting deliberate indifference to the constitutional rights of Mr. Mitchell and Mr. Mitchell's rights under the International Covenant on Civil and Political Rights, the United Nations Declaration on the Rights of Indigenous Peoples, and the Universal Declaration of Human Rights[.]" Doc. No. 1, ¶148. To Mitchell, Sheriff Kirchmeier "had the power to prevent or aid in the prevention of the wrongs done and conspired to be done as described [in his Complaint], yet failed or refused to do so[.]" Doc. No. 1, ¶149. Mitchell also appears to lodge a training, supervision, or discipline claim, arguing "Defendant Kirchmeier was deliberately indifferent to the need for further training, supervision, or discipline related to the use of less-lethal weapons and nondiscriminatory policing tactics, as reflected by the continued maintenance of the policies, practices, and customs of using excessive force and discriminatory policing that was carried out by the law enforcement officers under his control." Doc. No. 1, ¶150.

[¶101]    In support of dismissal, the Defendants assert Mitchell has failed to plead facts showing the officers violated his constitutional rights, a prerequisite they maintain must be met in holding Sheriff Kirchmeier liable for actions under Monell. Doc. No. 29, p.  The Court has found Mitchell has not alleged a viable excessive force claim, and thus, could deny this claim on that basis. However, even if there was a violation, the Court finds Mitchell has not alleged facts to support his specific Monell claims against Sheriff Kirchmeier.

i.    Unconstitutional Policies, Customs, or Practices

[¶102]    "A municipality may be liable under § 1983 when an official municipal policy or custom caused a violation of a plaintiff's substantive due process rights." Russell v. Hennepin Cty., 420 F.3d 841, 846 (8th Cir. 2005)." "Municipal officials who have final policymaking authority may,

by their actions, subject the government to Section 1983 liability.'" Id. (citing Angarita v. St. Louis County, 981 F.2d 1537, 1546 (8th Cir.1992)). "Before a municipality can be held liable, however, there must be an unconstitutional act by a municipal employee." Id.

[¶103]    "Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an 'official municipal policy,' (2) an unofficial 'custom,' or (3) a deliberately indifferent failure to train or supervise." Malone v. Hinman, 847 F.3d 949, 955 (8th Cir. 2017) (citations omitted). "Policy and custom are not the same thing." Id. "[A] 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." Id. "[T]he plaintiff must prove that the policy was the "moving force" behind a constitutional violation." Schaffer v. Beringer, 842 F.3d 585, 596 (8th Cir. 2016).

[¶104]    In the alternative, "a plaintiff may establish municipal liability through an unofficial custom of the municipality by demonstrating:

> 1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

Id.

[¶105]    Mitchell has not pled sufficient facts to establish Morton County may have had an unconstitutional policy or custom of using explosive less-lethal munitions in an unconstitutional manner which was the moving force behind the officers' alleged violation of his rights. As to policy, Mitchell has failed to point to "an official policy, a deliberate choice of guiding principle or procedure" of Morton County made by Sheriff Kirchmeier authorizing the use of unreasonable force. Mitchell has failed to point to an official policy either in writing or orally issued by Sheriff

Kirchmeier authorizing or persuading law enforcement officers to use less-lethal weapons in an unconstitutional manner. Stating in a conclusory fashion without support that Sheriff Kirchmeier directed, condoned, and/or ratified using excessive force and discriminatory policing does not suffice. Sheriff Kirchmeier's statements defending the use of force in previous encounters of law enforcement and protestors also does not state an official policy to use force unconstitutionally. Doc. No. 1, ¶39.

[¶106]    Furthermore, Mitchell has failed to put forth facts to support a plausible showing Sheriff Kirchmeier established a guiding principle or procedure wherein law enforcement officers were authorized or encouraged to utilize less-lethal weapons in an objectively unreasonable manner. Simply asserting numerous times in the Complaint the formulaic recitation that officers acted pursuant to the "strategies, actions, and practices that were created, devised, ordained and/or ratified by Defendant Kirchmeier for the County," is a conclusory statement to which Mitchell has failed to offer facts to substantiate.

[¶107]    As to custom, Mitchell has failed to point to "the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees." Mettler, 165 F.3d at 1204. Mitchell asserts "throughout the fall of 2016 and the winter of 2017, Defendant Kirchmeier and the Morton County Sheriff's Office regularly equipped the law enforcement officers under their direction, supervision, and authority with less-lethal weapons, including bean bag guns," further asserting some of these officers lacked adequate training in the use of less-lethal weapons. Doc. No. 1, ¶73.  He asserts the less-lethal weapons, including bean bag pellets, were used at DAPL protests throughout late 2016 and early 2017. Doc. No. 1, ¶74. However, there is nothing unconstitutional about law enforcement purchasing less-lethal weapons

nor does the fact that law enforcement officers were equipped with them, on its own, mean a pattern of constitutional violations occurred.

[¶108]    Moreover, Mitchell's statement that law enforcement officers routinely used less-lethal munitions unreasonably prior to his alleged injury is far too generalized to make the finding that law enforcement officers were engaging in a continuing, widespread, persistent pattern of unconstitutional misconduct. See Doc. No. 1, ¶87 ("[P]rior to Mr. Mitchell's injury, law enforcement officers responding to DAPL protests and acting under the authority, direction, and supervision of Defendant Kirchmeier and the Morton County Sheriff's Office routinely and indiscriminately used bean bag guns and other less-lethal weapons at unsafe distances and without precise aim to avoid body parts presenting a higher risk of serious injury or fatality."). Mitchell's reliance upon previous encounters between law enforcement and protestors also does not establish a continuing, widespread, persistent pattern. For example, the October 22 and October 27 encounters describe law enforcement's use of less-lethal weapons, but fail to allege facts showings they were used unconstitutionally. Doc. No. 1, ¶¶35-26. Injuries may occur even when force is used constitutionally. Furthermore, Mitchell's description of the November 20th protest going into the morning of the 21st makes unsupported allegations that law enforcement officers used weapons indiscriminately at that protest.

[¶109]    Furthermore, Mitchell has failed to allege facts showing Defendant Kirchmeier had notice of a pattern of alleged constitutional violations and tacitly authorized or was deliberately indifferent to their use or that this custom was the driving force behind his alleged injury. Mitchell asserts Morton County and Sheriff Kirchmeier routinely equipped law enforcement officers with less-lethal weapons throughout the fall of 2016 and winter of 2017. Doc. No. 1, ¶73. In a conclusory fashion, Mitchell asserts some of these officers lacked sufficient training in their use.

Doc. No. 1, ¶73. However, equipping officers with less-lethal weapons does not equate to Sheriff Kirchmeier having notice that any of these officers were using these weapons routinely in an unconstitutional manner. Mitchell makes no offering of facts that Defendant Kirchmeier had notice officers used these less-lethal weapons unconstitutionally. Mitchell's statement that Sheriff Kirchmeier could have prevented or aided in the prevention of the allegedly unconstitutional acts is far too conclusory and unsupported to find Sheriff Kirchmeier was on notice.

[¶110]    In addition, Mitchell has failed to establish the alleged custom was the "driving force" behind his injury. Simply asserting Morton County and Sheriff Kirchmeier allegedly equipped officers with less-lethal weapons, even if some were allegedly untrained in their use, does not suffice to show these officers who Mitchell alleges used less-lethal weapons in an unconstitutional manner did so at the direction of the County Defendant's policy or custom. Mitchell has therefore failed to put forth facts showing an alleged policy was the driving force behind his injury.

ii.    Violations Resulting from Training, Supervision, or Discipline

[¶111]    Mitchell also appears to assert a Monell claim against Sheriff Kirchheimer on a failure to train, supervise, or discipline theory. "To state a claim under § 1983, the plaintiff must plead that a government official has personally violated the plaintiff's constitutional rights." Jackson v. Nixon, 747 F.3d 537, 543 (8th Cir. 2014). "While the doctrine of respondeat superior does not apply to § 1983 cases, a supervisor may still be liable under § 1983 if either his direct action or his 'failure to properly supervise and train the offending employee' caused the constitutional violation at issue." Id. "Even if a supervisor is not involved in day-to-day operations, his personal involvement may be found if he is involved in 'creating, applying, or interpreting a policy' that gives rise to unconstitutional conditions." Id.

[¶112]    Sheriff Kirchmeier may therefore be liable under § 1983 if he "(1) had 'notice of a pattern of unconstitutional acts committed by subordinates'; (2) [was] deliberately indifferent to or tacitly authorized those acts; and (3) failed to take 'sufficient remedial action'; (4) proximately caus[ed] injury to the Plaintiff[]." Livers v. Schenck, 700 F.3d 340, 355–56 (8th Cir. 2012) (quoting Jane Doe A. v. Special Sch. Dist. of St. Louis Cnty, 901 F.2d 642, 645 (8th Cir.1990)). "In order to show deliberate indifference or tacit authorization, [Mitchell] must allege and ultimately prove Sheriff [Kirchmeier] 'had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation.'" Id.

[¶113]    For largely the same reasons as noted above, Mitchell's failure to train, supervise, or discipline theory also fails. Asserting Defendant Kirchmeier was deliberately indifferent to the need for training, supervision, or discipline because law enforcement officers under his control carried out policies, practices, and customs of using excessive force and discriminatory policing is not only conclusory in nature, but it does not show he had *notice* that any of the officers under his control were deploying force unconstitutionally. Doc. No. 1, ¶150. Mitchell admits Defendant Kirchmeier requested the assistance of numerous law enforcement officers from other agencies in not only North Dakota, but many other states. Simply asserting every officer who allegedly used force unconstitutionally was acting "under the direction and supervision" of Defendant Kirchmeier still fails to show it was brought to Defendant Kirchmeier's attention that these acts were occurring and is conclusory in nature.

[¶114]    It is not enough for Mitchell to nakedly assert Defendant Kirchmeier "had the power to prevent or aid in the prevention of the wrongs done" but failed to do so. Doc. No. 1, ¶149. Mitchell has failed to show Defendant Kirchmeier had notice his subordinates were using force unconstitutionally, that he authorized or was deliberately indifferent, and that he failed to take

remedial action. Mitchell's Complaint is also devoid of any specific deficiencies in any training programs by Morton County or Sheriff Kirchmeier in order to sustain a failure to train theory.

G.     State Law Claims (Counts X, XI, XII)

[¶115]   Mitchell asserts three state-law based claims. First, he lodges an Intentional Infliction of Emotional Distress (IIED) claim against Defendants Morton County Sheriff Kirchmeier, Morton County Sheriff's Deputy Piehl, Bismarck Police Officer Welk, North Dakota Highway Patrol Sergeant Kennelly, Morton County Sheriff's Deputy John Doe 1, and Bismarck Police Officer John Doe 2. Doc. No. 1, ¶155. He also lodges respondeat superior and indemnification claims against Morton County and the City of Bismarck. Doc. No. 1, ¶¶159-165.

[¶116]   To support his IIED claim, Mitchell asserts "[t]he acts and conduct of the Defendants were extreme and outrageous." Doc. No. 1, ¶156. He alleges "[t]he Defendants' actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to [him]." Doc. No. 1, ¶156. The Defendants move for dismissal of this claim, asserting Mitchell has failed to plead facts to support a claim for IIED under North Dakota state law. The Court agrees.

[¶117]    "The elements for intentional infliction of emotional distress are 'extreme and outrageous conduct that is intentional or reckless and causes severe emotional distress.'" Chegwidden v. Evenson, 2015 ND 131, ¶ 25, 863 N.W.2d 843, 850. "The first element for establishing intentional infliction of emotional distress is 'extreme and outrageous conduct' consisting of conduct that is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Botteicher v. Becker, 2018 ND 111, ¶ 15, 910 N.W.2d 861, 866. "Whether the threshold of extreme

and outrageous conduct has been met is a question of law for the court to decide." Id. "If reasonable people could differ regarding whether the defendant's conduct is extreme and outrageous, a plaintiff is entitled to have the trier of fact determine whether the conduct was sufficiently extreme and outrageous." Chegwidden, 863 N.W.2d at 850.

[¶118]    The Court does not find the officers' conduct to be extreme and outrageous. Mitchell admits 200 individuals were on the Bridge the evening in question. He concedes he was aware law enforcement officers were deploying less-than-lethal weapons against protestors. He admits he intentionally placed himself in front of these individuals. It is not outrageous and extreme for law enforcement officers to deploy less-than-lethal munitions upon a countdown when the officer's have probable cause to believe the person is trespassing and obstructing a government function, nor is it extreme and outrageous for law enforcement officers to use crowd-control tactics.

[¶119]    Furthermore, his general statement he "suffered from extraordinary mental and physical trauma, additional pain and suffering, and complete disruption of his enjoyment of daily life," is insufficient to meet the requirement of severe emotional distress. Doc. No. 1, ¶72. See Hamilton v. Mostad, No. A3-99-11, 2001 WL 1820383, at *3 (D.N.D. Aug. 6, 2001) ("Severe emotional distress generally means any type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so, including post-traumatic stress disorder, neurosis, psychosis, chronic depression, or phobia.") (citing 38 Am.Jur. *Fright, Shock, and Mental Disturbance* § 15 (2000)).

[¶120]    Because the Court is dismissing the IIED state-law claim, the collateral indemnification and respondeat superior claims against the City of Bismarck and Morton County are also dismissed.

### III.    <u>CONCLUSION</u>

[¶121]    The Court **GRANTS** Defendant Kennelly's Motion to Dismiss [Doc. No. 22] and the City and County's Motion to Dismiss [Doc. No. 24]. The Complaint is **DISMISSED WITH PREJUDICE**.

[¶122]    **IT IS SO ORDERED.**

DATED December 10, 2020.

Daniel M. Traynor, District Judge
United States District Court