**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

Marcus Mitchell,

Plaintiff,

vs.

Morton County Sheriff Kyle Kirchmeier,
Morton County, City of Bismarck, Morton
County Sheriff's Deputy George Piehl,
Bismarck Police Officer Tyler Welk, North
Dakota Highway Patrol Sergeant Benjamin
Kennelly, and John Does 1-2,

Defendants.

Civil No.: 1:19-cv-149

---

**AMENDED ORDER GRANTING CITY AND COUNTY DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AND DEFENDANT KENNELLY'S MOTION FOR
SUMMARY JUDGMENT**

---

## **INTRODUCTION**

[¶1]    THIS MATTER comes before the Court with two separate Motions for Summary

Judgment filed by Morton County Sheriff Kyle Kirchmeier ("Sheriff Kirchmeier"), Morton

County, Morton County Deputy George Piehl ("Deputy Piehl") and Bismarck Police Office Tyler

Welk ("Officer Welk")[1] and North Dakota Highway Patrol Sergeant Benjamin Kennelly

("Sergeant Kennelly") on February 8, 2024, and February 9, 2024, respectively. Doc. Nos. 93,

105. Plaintiff Marcus Mitchell ("Mitchell") filed his Response on March 14, 2024. Doc. No. 111.

The City and County Defendants and Sergeant Kennelly filed their Replies on April 11, 2024.

---

[1] These parties will be referenced as "the City and County Defendants."

Doc. Nos. 122, 126. For the reasons explained below, the City and County Defendants' Motion for Summary Judgment is **GRANTED** and Sergeant Kennelly's Motion for Summary Judgment is **GRANTED**.

## BACKGROUND

[¶2]     This case revolves around the events concerning the Dakota Access Pipeline ("DAPL") Protests beginning in August of 2016. North Dakota Law Enforcement first responded to a DAPL incident on August 10, 2016, when Sheriff Kirchmeier was notified protestors were blocking pipeline surveyors from accessing Cannonball Ranch. Doc. Nos. 95-10, p. 23:14-16; 111-1, p. 21:11-25. Within a week of the initial incident, Morton County declared a state of emergency due to the large number of protesters who were assembling and causing ongoing civil unrest. Doc. Nos. 95-10, pp. 43:19-23, 44:4-7; 26-1. Multiple law enforcement agencies, including the Bismarck Police Department, Morton County Sheriff's Office, and the North Dakota Highway Patrol, responded to the declaration. Doc. No. 95-10, p. 55:17-25. On August 15, 2016, the State of North Dakota issued its own emergency declaration. Doc. Nos. 95-10, p. 45:8-13; 111-3. By October 7, 2016, over 3,000 protestors had assembled and continued to grow by the day. Doc. No. 95-10, p. 50:8-18.

[¶3]     On October 7, 2016, Sheriff Kirchmeier petitioned the Governor of North Dakota to create a Unified Incident Command ("UIC") that would consist of leaders from multiple law enforcement agencies, including the Adjutant General for the North Dakota National Guard and the Colonel of the North Dakota Highway Patrol. Id. at pp. 45:14-46:20, 64:19-24. The leader of

each law enforcement agency-controlled members of their respective agencies. Id. at pp. 50:25, 51:1-7.[2]

[¶4]     Following the creation of the UIC, law enforcement was confronted with multiple violent clashes with protestors and observed rampant unlawful behavior. This behavior included, but is not limited to, the following: protestors damaging the Backwater Bridge, causing a partial closure (Doc. Nos. 95-10, pp. 275:25-276:9; 26-6; 96 at ¶¶18-19); law enforcement having to "push" protestors off of private land and construct a barricade to prevent further unlawful entry (Doc. No. 96, ¶ 19); a protestor firing multiple handgun rounds during a "push," (Doc. No. 95-5, p. 83:1-9); protestors towing away a dump truck that comprised part of a law enforcement barricade (See generally Dundon v. Kirchmeier, 85 F.4th 1250, 1254 (8th Cir. 2023); an officer being hit in the head by a large bolt (Doc. No. 111-43, p. 84:1-6); officers being struck by logs, bolts, and feces (Doc. No. 111-16, p. 54:10-15); and a protestor throwing a shield at officers (Doc. No. 111-17, p. 78:2-11). These events are only a few of many violent and unlawful events that occurred during the tumultuous time of the DAPL protests.

[¶5]     The Backwater Bridge was a focal point for many demonstrations throughout the DAPL protest. Dundon, 85 F.4th at 1254. Law enforcement erected a barricade on the north side of the Backwater Bridge, but the entirety of the bridge was inaccessible to the public at that time. Doc. Nos. 95-10, pp. 275:25-276:9; 26-6. All unauthorized persons who accessed the bridge during this

---

[2] The record here contains no specific record of Sheriff Kirchmeier's October 7 letter being granted by the Governor. However, because the record contains information about the UIC and command structure, the Court infers the request was granted. See Doc. No. 95-10, pp. 50:25-51:1, 52:19-24, 64:19-24.

time were trespassers in violation of the law.[3] Mitchell joined the protestors in November of 2016. Doc. No. 111-4, p. 90:12-18.[4]

[¶6]        On January 16, 2017, Mitchell joined protestors on the Backwater Bridge. Id. at pp. 123, 127. After a clash with law enforcement, Mitchell left the bridge but returned a short time later. Id. at pp. 135-39. On his second approach, Mitchell got in close proximity of the law enforcement barricade, where he would remain for several hours. Id. at p. 139. During this time, Mitchell admits he engaged in unlawful behavior and admitted: (1) he was on top of the barricade with other protestors for several hours in spite of law enforcement commands to get off (Doc. No. 111-4, pp. 144:25-145:5, 146:24-147:1); (2) that he crossed to the north side of the barricade (Id. at 145); (3) that he cut and removed concertina wire forming part of the barricade (Id. at 149-50); and (4) that his ultimate goal was to remove the barricade from the bridge (Id. at pp. 149-50). Law enforcement observed all of Mitchell's unlawful behavior. See generally Doc. Nos. 95-1; 95-3; see also 95-5, pp. 61-62; 111-4, pp. 144:25-145:5, 146:24-147:1, 150:21-151:13.  Mitchell arrived at Backwater Bridge again on January 17, 2024, where law enforcement had to push protestors off the bridge to enforce law and order. Doc. No. 111-4, pp. 195-96, 205-08.

## I.    The Events of January 18 and 19, 2017

[¶7]        On January 18, 2017, Sergeant Kennelly was scheduled as the night shift forward command. Doc. No. 111-7, p. 91:14-24. Due to the nature of the forward command rotating schedule, officers on scene did not necessarily know who Sergeant Kennelly was or work with

---

[3] For a more thorough discussion of the Backwater Bridge closure, see this Court's Order Granting Motion for Summary Judgment in Dundon v. Kirchmeier, 577 F. Supp. 3d 1007, 1044-46 (D.N.D. 2021).

[4] When referencing page numbers for Doc. No. 111-4, the Court is referencing the docket page number, not the internal page number. For instance, when referencing page 90 of the docket pagination, it is page 89 of the deposition.

him directly. See Doc. No. 111-5, pp. 207:25-208:7. Prior to starting his shift, Sergeant Kennelly spoke with the day shift and learned he should report to the Backwater Bridge. Doc. No. 111-7, p. 92:8-20. Shortly thereafter, Sergeant Kennelly worked with day shift forward command to remove a teepee that was on Highway 1806, just south of the law enforcement barricade. Id. at 94:21-23; Doc. No. 99-1, p. 1.

[¶8]     In the proceeding hours, law enforcement witnessed protestors engage in increasingly violent and illegal behavior. See Doc. No. 106-20, pp. 194:4-8, 195:19-25 (law enforcement observing ice, water bottles, and a road flare being thrown at them, and witnessing razor wire being cut by protestors); Doc. No. 111-5, pp. 214:15-21, 284:24-285:3 (protestors throwing ice chunks and water bottles at law enforcement, and an individual was attempting to flank the law enforcement barricade); Doc. No. 106-23, pp. 143:1-11, 154:3-11, 158:4-18, 204:4-16 (protestors with shields throwing ice chunks, starting a fire on the bridge, using flashlights to blind law enforcement, and erecting a teepee on the bridge); Doc. No. 111-16, pp. 74:24-75:11 (officer observing riotous behavior and noting his belief there were six reported law enforcement injuries as a result of the protestors violent behavior).

[¶9]     Throughout the night, law enforcement commanded the protestors to disperse from the bridge using a loudspeaker. Doc. Nos. 106-19, p. 152:23-25; 106-20, p. 194:14-16; 111-17, p. 128:19-23. Starting at 8:15 p.m., and ending at approximately 11:30 p.m., Sergeant Kennelly engaged in five separate negotiations with protestors in an attempt to resolve the matter peacefully, cease the protestors unlawful activities, and restore order to the Backwater Bridge. Doc. Nos. 95-1; 99-1, pp. 1-2; 106-5, 13:57-15:09; 106-11, 26:25-30:11; 106-12, 0:00-8:15. Mitchell was among the protestors who engaged in negotiations and was seen at the bridge multiple times throughout the night. Doc. No. 95-4, pp. 226:14-25, 228:3-8.

[¶10]     After Sergeant Kennelly failed to resolve the matter peacefully, he contacted the Tactical Operations Center ("TOC") to discuss how to address the situation. Doc. No. 111-7, p. 99:14-23. The TOC granted Sergeant Kennelly permission to use law enforcement officers to effect the arrest of protestors south of the barricade. Id. at 108:24-109:19. At this point, officers believed they had probable cause for multiple crimes including rioting, trespassing, simple assault, and aggravated assault on peace officers. Id. at 103:5-12.

[¶11]     Law enforcement devised a plan to enact a "push" to get on Backwater Bridge and effect the arrest of protestors. Id. at 104:1-11. While planning the push, Sergeant Kennelly did not direct officers to employ force nor identify protestors deemed "agitators" for arrest. Id. at 105:21-106:2, 109:2-12. Sergeant Kennelly only gave the command for officers to use force to protect themselves or others, or to use the minimal amount of force needed to effect an arrest. Id. at 150:6-10. The first push began at approximately 12:15 a.m. on January 19, 2017. Doc. No. 106-13, 23:00. During this push, a protestor tried to topple teepee poles on law enforcement. Doc. No. 106-22, pp. 46:2-9, 51:9-13, 86:2-14. Law enforcement employed less-lethal munitions and arrested 19 protestors during this push, where they also collected various weapons and equipment including a crowbar, the lights used for blinding, and shields. Doc. Nos. 95-4, p. 235:22-236:3; 99-1, p. 2; 106-23, p. 216:7-13; 111-7, p. 128:3-7. Law enforcement returned to their side of the barricade by 1:00 a.m. Doc. No. 99-1, p. 2. Mitchell kept himself out of reach of officers and would flee south during the push, avoiding arrest. Doc. No. 95-4, pp. 231:9-23, 233:12-23.[5]

---

[5] This was a common tactic used by Mitchell, which he repeated on more than one occasion to escape law enforcement. Mitchell claims in his testimony he did not do this to flee law enforcement, but to ensure his safety. Doc. No. 95-4, pp. 231:9-23, 233:12-23. Regardless of his reasoning, his admission to "staying ahead" of law enforcement is the same as admitting to fleeing from law enforcement.

[¶12]     After only a few minutes had passed, Mitchell and other protestors returned to the bridge and were on top of the barricade. Doc. Nos. 106-14, 27:00-30:05; 106-15, 0:00-2:30; 106-23, p. 216:20-25. Law enforcement gathered again and decided to conduct a second push at approximately 1:26 a.m. Doc. No. 106-15, 27:00-30:17. Among the officers gathered were Sergeant Kennelly, Deputy Piehl, then-Sergeant Bryan Steele ("Sergeant Steele"),[6] and Officer Welk. Sergeant Steele pointed out the protestors to be arrested to Deputy Piehl, which included Mitchell. Doc. No. 111-17, pp. 93:13-94:18.[7] Deputy Piehl relayed this information to Officer Welk. Doc. No. 111-17, p. 111:1-22. Officers and protesters formed parallel lines facing each other. Doc. No. 95-4, pp. 238:23-239:6. Mitchell was part of the protestor line holding shields. Id. During this time, Deputy Piehl heard officers commanding protestors to disperse and leave the bridge. Doc. No. 111-17, p. 128:15-23. A countdown was given to protestors before shots were discharged. Id. at 114:11-15.

[¶13]     Sergeant Kennelly remained north of the law enforcement barricades. Doc. No. 111-7, pp. 108:14-18, 181:23-182:5. In this position, Sergeant Kennelly could not see the second push south of the barricade. Id. Once law enforcement started the second push, Mitchell claims to have been shot at four separate times with bean bag rounds. Doc. No. 95-4, pp. 246:18-23. One shot hit his shield and fell to the ground. Id. at 246:24-247:4. The second round hit Mitchell in the eye,[8] causing him to spin and be hit a third time in the back of the head. Id. at 247:21-25. The fourth-round hit Mitchell in the leg. Id. at 248:1, 7. Mitchell claims the shots all occurred in a matter of

---

[6] Sergeant Steele is now Captain, but the Court will refer to his title at the time of this incident. Doc. No. 111-16, pp. 11:15-12:2.

[7] Sergeant Steele does not specifically recall instructing Deputy Piehl to arrest Mitchell, but claims he may have. Doc. No. 111-16, p. 67:2-18.

[8] This second round caused extensive damage to Mitchell. The bean bag round entered his eye socket, shattering the orbital wall of his eye and cheekbone, and ripping open his skin to near his left ear. Mitchell's injury can be seen on video. Doc. No. 95-1, 1:22:00 – 1:22:10.

seconds, causing him to believe four different officers fired rounds at him. Id. at 248:10-14.[9]

Mitchell believes the officer who shot him in the eye was wearing a blue shirt with black pants.

Id. at 306:20-307:4.[10] During this second push, Mitchell raised his shield to head height, lowered

the shield in order to raise his hands, and then bent down and used his arms to pick up the shield

again. Doc. No. 95-4, pp. 248:15-249:9.

[¶14]    Deputy Piehl testified he fired one round at Mitchell, aiming above Michell's knee but

below Mitchell's shield. Doc. No. 111-17, p. 113:7-13. Deputy Piehl claims less lethal munitions

were needed to arrest protestors because when officers tried to arrest protestors before, they would

run away. Id. at 115:1-7. Deputy Piehl was wearing a brown jacket during this incident. Doc. No.

111-17, p. 164:1-4. Officer Welk also testified he fired a single round at Mitchell at the direction

of Bismarck Police Department Lieutenant Jason Stugelmeyer. Doc. Nos. 103-1, p. 1; 111-5, pp.

116:18-24, 226:6-19. Officer Welk observed the single round he fired hit Mitchell in his lower

extremity. Doc. No. 103-1, p. 2.

## PROCEDURAL HISTORY

[¶15]    On July 18, 2019, Mitchell filed a twelve-count complaint against the City and County

Defendants and Sergeant Kennelly. Doc. No. 1. The City and County Defendants and Sergeant

Kennelly each filed a Motion to Dismiss for failing to state a claim on October 4, 2019. Doc. Nos.

22; 24. On December 10, 2020, this Court granted the City and County Defendants' and Sergeant

Kennelly's motions, dismissing Mitchell's complaint in its entirety with prejudice. Doc. No. 38.

---

[9] While Mitchell claims it is his belief four different officers shot him, he also argued in his brief
that Officer Welk and Deputy Piehl shot multiple rounds at him. Doc. No. 111, p. 9. This
contradicts the record and Mitchell's own testimony. Doc. No. 95-4, p. 248:10-14 (Mitchell stating
his belief that due to the speed at which the rounds were fired, four different individuals fired
rounds at him). The undisputed evidence shows Officer Welk and Deputy Piehl each fired a single
round at Mitchell, not numerous rounds.
[10] This description matches the uniform of the Bismarck Police Department.

[¶16]    Mitchell appealed the decision on January 8, 2021, arguing (1) a Section 1983 claim against the officers who allegedly shot him for retaliatory use of force in violation of his First Amendment rights, (2) a Section 1983 claim against the officers who allegedly arrested him for retaliatory arrest in violation of his First Amendment rights, (3) a Section 1983 claim against the officers who allegedly shot him for use of excessive force in violation of his Fourth Amendment rights, (4) a Section 1983 claim against Sergeant Kennelly for failure to intervene to prevent the use of excessive force, (5) a Section 1983 claim against the officers who allegedly shot him for discrimination on the basis of "his status as an Indigenous person" in violation of the Equal Protection Clause of the Fourteenth Amendment, and (6) a Monell claim against Morton County insofar as this claim asserted municipal liability for the Fourth Amendment and Equal Protection Clause violations. Doc. No. 40; see also Mitchell v. Kirchmeier, 28 F.4th 888, 894 (8th Cir. 2022).

[¶17]    On March 14, 2022, the Eighth Circuit determined Mitchell waived all other challenges to this Court's dismissal of Mitchell's other claims, but reversed the dismissal of (1) Mitchell's claim against the officers who allegedly shot him for use of excessive force, (2) Mitchell's Monell claim against Morton County insofar as this claim asserted liability for the use of excessive force, and (3) Mitchell's failure-to-intervene claim against Sergeant Kennelly insofar as this claim asserted liability for the use of excessive force. Id. at 894, 903. The Eighth Circuit affirmed the dismissal with prejudice of the remainder of Mitchell's claims and remanded the case for further proceedings. Id. Once remanded, discovery was conducted and pretrial motions were filed until the City and County Defendants and Sergeant Kennelly filed their respective Motions for Summary Judgment. Doc. Nos. 93; 105.

## DISCUSSION

### I.    Summary Judgment Standard

[¶18]    Summary judgment is appropriate when the evidence, viewed in the light most favorable to the non-movant, indicates there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it may affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-movant.  Id.  "We give the nonmoving party the benefit of all reasonable inferences which may be drawn without resorting to speculation."  TCF Nat'l Bank v. Mkt. Intelligence, Inc., 812 F.3d 701, 707 (8th Cir. 2016). The Court does not weigh the evidence nor make credibility determinations, rather it only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. See Anderson, 477 U.S. at 252; see also Kammueller v. Loomis, Fargo & Co., 383 F.3d 779, 784 (8th Cir. 2004) (noting that because the court views the facts in the light most favorable to the nonmoving party, the court does not weigh the evidence or attempt to determine the credibility of the witnesses).

[¶19]    The purpose of summary judgment is to determine whether the evidence presents sufficient disagreement as to warrant submission of the case to a jury or whether the evidence is so one-sided that one party must prevail as a matter of law.  Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 832 (8th Cir. 2005).  The movant bears the burden of informing the Court of the basis for its motion and must identify portions of the record which demonstrate the absence of a genuine issue of material fact.  Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011).  The non-movant may not rely on allegations or denials made in its pleading, rather its response must set out specific facts showing a genuine issue for trial.  Id.; Fed. R. Civ. P.

56(c)(1)(A).  There is no genuine issue for trial and summary judgment is proper when the record,

taken as a whole and viewed in the light most favorable to the non-movant, could not lead a rational

trier of fact to find in favor of the non-movant. Diesel Mach., Inc., 418 F.3d at 832.

## II.  Excessive Force

[¶20]    This Order is guided by the Eighth Circuit's decision in Mitchell v. Kirchmeier, where

the Eighth Circuit remanded three issues to this Court for further examination. Those issues are:

> (1) Mitchell's claim against the officer who allegedly shot him for use of excessive
> force, (2) Mitchell's Monell claim against Morton County insofar as this claim
> asserted liability for the use of excessive force, and (3) Mitchell's failure-to-
> intervene claim against Sergeant Kennelly insofar as this claim asserted liability for
> the use of excessive force.

28 F.4th 888, 903 (8th Cir. 2022). Thus, if the Court finds officers did not engage in excessive

force, the remaining claims against Sergeant Kennelly, Sheriff Kirchmeier, John Does 1 and 2,

and Morton County necessarily fail. Therefore, the Court will examine the excessive force claims

as to Officer Welk, Deputy Piehl, and John Does 1 and 2.

### A.  Legal Standards

[¶21]    Section 1983 of Title 42 of the United States Code provides a cause of action against

government officials who deprive other persons of rights, privileges, or immunities secured by the

Constitution. However, government officials may be entitled to dismissal of such actions under

the doctrine of qualified immunity. Hassan v. City of Minneapolis, 489 F.3d 914, 919 (8th Cir.

2007). Qualified immunity shields police officers from liability for civil damages when their

conduct "does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." White v. Pauly, 580 U.S. 73, 78-79 (2017) (per curiam)

(quotation omitted). Qualified immunity is not just a defense to liability; it constitutes immunity

from suit. Hayek v. City of St. Paul, 488 F.3d 1049, 1054 (8th Cir. 2007).

[¶22]     To survive summary judgment dismissing his Section 1983 claim, Mitchell must offer evidence showing (1) a statutory or constitutional right was violated; and (2) the right was "clearly established." Hansen v. Black, 872 F.3d 554, 557-58 (8th Cir. 2017). The second step of the analysis is fact-intensive and "must be undertaken in light of the specific context of the case, not as a broad general proposition." Samuelson v. City of New Ulm, 455 F.3d 871, 875 (8th Cir. 2006). (quoting Littrell v. Franklin, 388 F.3d 578, 583 (8th Cir. 2004)). If no constitutional violation occurred, the evaluation ends there. See Fagnan v. City of Lino Lakes, 745 F.3d 318, 322 (8th Cir. 2014). "[W]hen the issue of unreasonable force is raised in a motion for summary judgment, a court must construe the facts in favor of [ ] the non-moving party." Westwater v. Church, 60 F.4th 1124, 1128-29 (8th Cir. 2023) (citing Frederick v. Motsinger, 873 F.3d 641, 644 (8th Cir. 2017)).

[¶23]     Mitchell argues Officer Welk, Deputy Piehl, and John Does 1 and 2 violated his constitutional right to be free from excessive and unreasonable force under the Fourth Amendment. The Fourth Amendment includes the right "to be secure . . . against unreasonable . . . seizures." U.S. Const. amend. IV. Citizen claims that a police officer "used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of his person . . . are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." Graham v. Connor, 490 U.S. 386, 388 (1989).

[¶24]     "[D]etermining whether the force used to effect a particular seizure is 'reasonable' requires balancing of the individual's Fourth Amendment interests against the relevant governmental interests." County of L.A. v. Mendez, 581 U.S. 420, 427 (2017) (quoting Graham, 490 at 396). The inquiry is based on the totality of the relevant circumstances, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."

Graham, 490 U.S. at 396. The degree of injury suffered, to the extent "it tends to show the amount and type of force used," is also relevant to the excessive force inquiry. Chambers v. Pennycook, 641 F.3d 898, 906 (8th Cir. 2011). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Gill v. Maciejewski, 546 F.3d 557, 562 (8th Cir. 2008) (quoting Graham, 490 U.S. at 396-97). The Court must analyze these factors from "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396.

[¶25]   "[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." Mullenix v. Luna, 577 U.S. 7, 12 (2015) (per curiam) (alteration and internal quotation marks omitted). Use of excessive force is an area of the law "in which the result depends very much on the facts of each case," and thus police officers are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue. Id. at 13 (alterations in original). Precedent involving similar facts can help move a case beyond the otherwise "hazy border between excessive and acceptable force" and thereby provide an officer notice that a specific use of force is unlawful. Id. at 18 (internal quotation marks omitted).

[¶26]   The Court will begin by examining each party Mitchell has claimed violated his constitutional rights and then proceed to discuss whether those rights were clearly established at the time of the alleged incident.

**B. John Doe Defendants**

[¶27]    The claims against John Doe Defendants 1 and 2 must be dismissed because (1) Mitchell failed to respond to the arguments posed by the City and County Defendants and Sergeant Kennelly, (2) Mitchell has yet to identify the John Does after extensive discovery, and (3) it is time-barred by the statute of limitations.

[¶28]    Mitchell has failed to address in his Response why John Does 1 and 2 should not be dismissed. By not responding, Mitchell has waived any argument in opposition to the Defendants' summary judgment motion on this claim. City of Kennett v. EPA, 887 F.3d 424, 430 (8th Cir. 2018) (holding plaintiff's claim was waived when it did not respond to defendant's arguments for summary judgment on that claim); Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs., 558 F.3d 731, 735 (8th Cir. 2009) ("[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument.").

[¶29]    Additionally, dismissal is proper when it appears that the true identity of the defendant cannot be learned through discovery or the court's intervention. Munz v. Parr, 758 F.2d 1254, 1257 (8th Cir. 1985) (cleaned up). Here, discovery has closed after it had been ongoing for nearly a year, and Mitchell has not come forward with facts to identify who the unknown defendants are. See Gold Star Taxi & Transp. Serv. v. Mall of Am. Co., 987 F.Supp. 741, 753 (D. Minn. 1997) (dismissing claims against unidentified John Does because "[e]ven after the completion of discovery, Plaintiffs have not ascertained the identity of or established any facts regarding these unnamed Defendants"). Thus, Mitchell's failure to identify the John Does serves as grounds for dismissal.

[¶30]    Finally, the statute of limitations on a Section 1983 claim in North Dakota is six years. See Twardowski v. Bismarck Police Dep't, 754 F. App'x 492 (8th Cir. 2019) (citing Owens v. Okure,

488 U.S. 235, 249-50 (1989) (explaining section 1983 actions borrow the general or residual statute of limitations for personal injury actions)); N.D.C.C. § 28-01-16(5) (providing a six-year statute of limitations for personal-injury actions). In this case, that expired on or about January 20, 2023, or six years from the January 19, 2017 incident. By failing to raise his claim against the John Doe Defendants in a timely manner, Mitchell has forfeited his claims against them.

[¶31]   Because Mitchell failed to respond to these arguments, has not identified the defendants, and failed to bring his claim within the statute of limitations, John Does 1 and 2 must be dismissed from this case. Accordingly, Defendant's Motion for Summary Judgment for John Does 1 and 2 is **GRANTED**.

### C. Officer Welk and Deputy Piehl

[¶32]   The City and County Defendants and Sergeant Kennelly argue Officer Welk and Deputy Piehl are entitled to summary judgment under qualified immunity because they did not use excessive force in effecting the arrest of Mitchell and, even if excessive force was used, it was not clearly established at this time that such force violated Mitchell's constitutional rights. Mitchell argues there are genuine issues of material fact that preclude finding summary judgment in favor of the City and County Defendants and that the Defendants are not entitled to qualified immunity under these circumstances.

#### 1. Objectively Reasonable

##### i. "Disputed Facts"

[¶33]   Mitchell attempts to establish disputed facts that preclude the finding of summary judgment for the Defendants. Each of these "disputed facts" are easily disposed. Mitchell's first claim is the parties dispute whether he was a peaceful protestor or an agitator. Regardless of Mitchell's label, it is his conduct discussed in detail below that will determine if summary

judgment is warranted, not his label. The argument itself is a red herring and does not impact the outcome of this case. Mitchell next argues he was not provided sufficient warning and opportunity to comply before officers shot him. This is incredible when considering the record. Whether he heard warnings given and whether warnings were issued are two different things. Officers had negotiated for hours to get protestors off the bridge. Doc. Nos. 95-1; 99-1, pp. 1-2; 106-5, 13:57-15:09; 106-11, 26:25-30:11; 106-12, 0:00-8:15. A loudspeaker was used to announce that the protestors were to leave the bridge and disburse. Doc. Nos. 106-19, p. 152:23-25; 106-20, p. 194:14-16; 111-17, p. 128:19-23. A countdown was given before the push. Doc. No. 111-17, p. 114:11-15 While law enforcement did not give individualized commands to disburse, the general warnings given were sufficient to provide notice. Doc. No. 111-16, pp. 68:4-5, 69:14-15, 69:1-71:16. Mitchell's argument he was not provided sufficient warning fails.

### ii.    Severity of the Crime

[¶34]    The City and County Defendants and Sergeant Kennelly argue Mitchell was engaged in serious crimes prior to less-lethal munitions being deployed, making this factor weigh in their favor. Mitchell argues that, by only having participated in nonviolent misdemeanor crimes, the use of more than de minimis force is objectively unreasonable.

[¶35]    Looking at the severity of the crime, Mitchell was engaged in numerous illegal actions, some of which constituted felonious conduct. This included: inciting a riot (N.D.C.C. § 12.1-25-01 (a class C felony)); trespassing (N.D.C.C. § 12.1-22-03); simple assault (N.D.C.C. 12.1-17-01); aggravated assault on peace officers (N.D.C.C. § 12.1-17-01 (a felony)); destruction of both public and government property, (N.D.C.C. §§ 12.1-21-05; 24-03-05 (Mitchell admitted to cutting concertina wire)); engaging in a riot (N.D.C.C. § 12.1-25-03); disobedience to public safety orders under riot conditions (N.D.C.C. § 12.1-25-04); arming rioters (N.D.C.C. § 12.1-25-02 (a class C

felony)); felony terrorizing (N.D.C.C. § 12.1-17-04); and physical obstruction of a government function (N.D.C.C. § 12.1-08-01 (holding a shield in opposition to law enforcement)). Doc. Nos. 94, pp. 44-47; 95-5, p. 82:15-22; 95-7, p. 103:5-25; 95-16; 95-17; 99-1, p. 2; 111-4, p. 150:21-24. By the time of the second push, Mitchell had at a minimum engaged in criminal trespass, obstruction of a government function, engaging in a riot, and actively resisting and evading arrest. These violations of the law, which includes felonious conduct, are sufficiently serious to warrant a finding that it was objectively reasonable to employ less lethal munitions at Mitchell.

[¶36]    Mitchell argues he was suspected of no more than trespassing and obstructing a government function when less-lethal munition were fired upon him, which the Eighth Circuit has ruled to be insufficient reasoning to employ less-lethal munitions. Mitchell, 28 F.4th at 898. However, the Court must consider all the circumstances leading up to the second push, not just the push itself. When considering the totality of the circumstances listed above, Mitchell was clearly engaged in a multitude of serious felony crimes. Graham, 490 U.S. at 396.

[¶37]    For those reasons, this factor weighs in favor of Deputy Piehl and Officer Welk.

### iii.  Whether Mitchell Posed an Immediate Threat to the Safety of Officers

[¶38]    The Defendants argue Mitchell posed a threat to the safety of officers and others on scene due to the riotous conditions and Mitchell's conduct. Mitchell claims he did not pose a threat to law enforcement because he was peacefully protesting.

[¶39]    Here, it was reasonable for Officer Welk and Deputy Piehl to believe Mitchell posed a threat to their own and their fellow officers' safety. From January 16 to January 19, 2017, law enforcement faced numerous violent altercations with protesters. This included protestors throwing large bolts, ice chunks, water bottles, feces, and riot shields at law enforcement. Doc. Nos. 106-23, p. 154:3-11; 111-5, pp. 214:15-21; 111-16, pp. 54:10-15, 74:24-75:11; 111-17, p.

78:2-11; 111-43, p. 84:1-6. Protestors had threatened law enforcement on numerous occasions stating they would kill the officers. Doc. Nos. 111-16, p. 82:15-22; 111-8, 0:00 - 1:30. Mitchell was seen cutting concertina wire. Id. at pp. 61:23-62:3. Sergeant Steele believed he saw Mitchell starting fires with tires along the eastern flank of the bridge. Id. at 62:8-9. Mitchell was seen at various times throughout the protest equipped with a shield and a gas mask. Doc. Nos. 106-23, p. 173:5-9; 111-4, pp. 256:15-20, 296:11-13. Mitchell admits he was part of the shield wall to prevent law enforcement from going to their camp. Doc. No. 111-4, p. 240:7-11. Mitchell would position himself on top of the police barricade on multiple occasions, taunting law enforcement. Doc Nos. 111-4, p. 150: 21-24; 111-16, pp. 61:23-62:3. During negotiations, Mitchell escalated the situation by telling officers "[f]uck you." Doc No. 111-4, pp. 227:24-228:3. Law enforcement believed Mitchell had committed a series of serious felony crimes. Considering the totality of the circumstances, a reasonable officer on scene would perceive Mitchell as a threat to an officer's safety. Graham, 490 U.S. at 396.

[¶40]    Accordingly, this factor weighs in favor of the Defendants.

### iv. Actively Resisting or Evading Arrest by Flight

[¶41]    The Defendants argue Mitchell actively fled law enforcement on numerous occasions and was resisting law enforcement, so it was objectively reasonable for law enforcement to believe Mitchell would flee again. Mitchell argues he was not running away when law enforcement fired less-lethal munitions at him.

[¶42]    Mitchell admitted to fleeing from officers anytime they would conduct a push on the protestors. Doc. No. 95-4, pp. 231:9-23, 233:12-23. After fleeing, Mitchell proceeded back to the bridge and repeat to process over and over again. Mitchell is seen on video holding a shield in open defiance of law enforcement commands to disperse, constituting active physical resistance

to arrest. <u>Zubrod v. Hoch</u>, 907 F.3d 568, 578, n. 5 (8th Cir. 2018) (noting how an individual can actively resist arrest by physically struggling, threatening, or **disobeying officers**) (emphasis added); Doc. No. 95-1, 1:10:00; <u>see also</u> Doc. No. 95-5, pp. 238:23-239:16. This establishes Mitchell utilizing a pattern of flight in order to avoid apprehension by law enforcement.

[¶43]    Furthermore, there is caselaw that says more than "de minimis" force may be utilized in situations where an officer can reasonably believe the suspect will engage in conduct like fleeing or threatening the safety of officers or where force may be utilized to regain control of a situation. <u>See</u> <u>McKenney v. Harrison</u>, 635 F.3d 354, 357-58, 360 (8th Cir. 2011) (officer is entitled to qualified immunity on excessive force claim where officer believed suspect was evading arrest through flight, even though the charges were misdemeanors and there was no indication suspect war armed or threatened officer safety); <u>Boudin v. Harsson</u>, 962 F.3d 1034, 1041 (8th Cir. 2020) (trooper entitled to qualified immunity on excessive force claim where trooper reasonably believed suspect was about to resume flight from scene); <u>Ehlers v. City of Rapid City</u>, 846 F.3d 1002, 1009-10 (8th Cir. 2017 (appearance of resisting arrest can justify use of force where, even though plaintiff was being arrested for nonviolent misdemeanors, the plaintiff's refusal to adhere to commands, among other factors, could be construed as resistance necessitating the use of force); <u>Carpenter v. Gage</u>, 686 F.3d 644, 650 (8th Cir. 2012) (use of force reasonable where suspect engaged in active resistance by refusing officer commands); <u>Kelsay v. Ernst</u>, 933 F.3d 975, 981 (8th Cir. 2019) (officers may apply force to regain control of a situation and maintain law and order).

[¶44]    Mitchell argues he was not running away during the second push. However, Mitchell testified he would evade arrest when law enforcement conducted prior pushes by "staying ahead" of (aka flee) law enforcement, only to return a short time later and repeat the process. Doc. No.

95-4, pp. 231:9-23, 233:12-23. Video evidence shows Mitchell fleeing from law enforcement. Doc. Nos. 106-15, 27:20; 106-11, 5:30. Mitchell's arguments to the contrary fail.

[¶45]     Therefore, this factor weighs in favor of the Defendants.

### v. Other Relevant Circumstances

[¶46]     "Liability for damages for a federal constitutional tort is personal, so each defendant's conduct must be independently assessed." Smith v. City of Minneapolis, 754 F.3d 541, 547 (8th Cir. 2014). "Section 1983 does not sanction tort by association [so] an officer may be held liable only for his or her own use of excessive force." Id. at 547-48, Here, Officer Welk testified he shot Mitchell in his lower extremity, which is corroborated by Mitchell's claim one round struck him on the leg. This was not an excessive use of force under the circumstances and was objectively reasonable. Deputy Piehl, on the other hand, did not witness his round strike Mitchell. It is not known whether Piehl's round struck Mitchell's shield, or is the round that struck Mitchell in the eye or back of the head. Regardless, at this stage in the litigation, the facts must be construed in favor of Mitchell.[11]

[¶47]     More importantly, an excessive force claim under section 1983 cannot be supported by mere negligent or grossly negligent conduct. See Daniels v. Williams, 474 U.S. 327, 335-36 (concluding a negligence claim does not implicate any aspect of the due process clause); Young v. City of Little Rock, 249 F.3d 730, 734 (8th Cir. 2001) (holding an officer's negligence does not normally give rise to a claim under Section 1983); Roach v. City of Fredericktown, 882 F.2d 294, 297 (8th Cir. 1989) (noting negligent or "grossly negligent" conduct does not state a claim under

---

[11] While Deputy Piehl testified he was aiming below Mitchell's shield but above his knee, there is simply insufficient evidence to establish where Deputy Piehl's shot went. The individual assessment standard thus weighs against Deputy Piehl in finding he did not engage in excessive force.

Section 1983) (citing <u>Myers v. Morris</u>, 810 F.2d 1437, 1468 (8th Cir. 1987), <u>abrogated on other</u> <u>grounds by</u> <u>Burns v. Reed</u>, 500 U.S. 478 (1991)).

[¶48]    Here, Mitchell has failed to present any evidence to show Officer Welk's and Deputy Piehl's conduct was anything more than negligence or gross negligence. The Defendants both testified they were aiming at Mitchell's lower extremities. Mitchell himself testified during the incident that he raised his shield to head height, lowered the shield, raised his hands, but then bent down and used his arms to pick up the shield again when the second round hit his eye. Doc. No. 95-4, pp. 248:15-249:9. This movement could have caused a round aimed at Mitchell's leg to otherwise strike him in the eye. Officer Welk struck Mitchell's leg. Mitchell claimed someone matching the description of a Bismarck Police Department uniform is the one who struck his eye. Deputy Piehl is from the Morton County Sheriff's office, so he does not wear the Bismarck Police Department uniform, and Deputy Piehl was wearing a brown jacket on the night of January 19, 2017. Doc. Nos. 95-4, pp. 306:20-307:4; 111-17, p. 164:1-4.

[¶49]    Mitchell is unable to prove, beyond speculation, whether Deputy Piehl's round is the one that struck Mitchell's eye. Mitchell must provide some sort of evidence to survive a summary judgment motion. <u>See</u> <u>Gibson v. Am. Greetings Corp.</u>, 670 F.3d 844, 854 (8th Cir. 2012) ("The mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.") (quoting <u>Anderson</u>, 477 U.S. at 252); <u>Thomas v. Corwin</u>, 483 F.3d 516, 527 (8th Cir. 2007) ("Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions are insufficient to withstand a motion for summary judgment."). Mitchell has failed to provide any evidence that either officer intended to cause Mitchell harm. Thus, Mitchell has failed to meet his

burden that Officer Welk and Deputy Piehl engaged in anything more than grossly negligent conduct.

[¶50]    Under these circumstances, the Court finds the use of force was reasonable. For hours, law enforcement watched as Mitchell and other protestors engaged in lawlessness. Mitchell refused to adhere to commands to leave the bridge. Mitchell and protestors had the benefit of negotiating with law enforcement to try and resolve the matter peacefully before they employed force. Those peaceful negotiations failed, wherein Mitchell escalated the situation by cursing at law enforcement. The protestors were forming a large and riotous crowd on the bridge. Mitchell successfully evaded arrest during the first push that night, and on numerous other occasions prior to this incident. After each flight, Mitchell would choose to break the law and return to the Backwater Bridge. Mitchell was seen cutting concertina wire. Mitchell was seen on top of the police barricade multiple times throughout the protest, including the night in question. On the second push, Mitchell was actively resisting arrest by forming a line of protestors holding shields in opposition to law enforcement. These were tense, rapidly evolving circumstances that the Court must view as a reasonable officer on scene, not through hindsight. Presented with these circumstances, any reasonable officer on scene would agree that at this point, law enforcement was left with no other reasonable alternative other than to deploy less-lethal munitions to disperse the protestors who were illegally on the bridge, effect the arrest of protestors, and restore order to the scene.

### 2.  Whether Right was Clearly Established

[¶51]    Even if the officers use of force was objectively unreasonable, it was not clearly established at that time that such conduct violated Mitchell's rights.

[¶52]    To begin, the Eighth Circuit rejected this Court's previous reliance on <u>Bernini v. City of St. Paul</u>, 665 F.3d 997 (8th Cir. 2012) because the Court has to construe the facts in favor of Mitchell under the 12(b)(6) standard. <u>Mitchell</u>, 28 F.4th at 899. The Eighth Circuit said "[u]nless and until discovery tells a different story, the officers are not entitled to qualified immunity." <u>Id.</u>; <u>see also</u> <u>Baude v. Leyshock</u>, 23 F.4th 1065, 1072-73 (8th Cir. 2022) (distinguishing what the plaintiff alleged in support of his unreasonable-seizure claim from what the evidence showed at the summary judgment stage in <u>Bernini</u>). Now that extensive discovery has taken place, the evidence shows it was not clearly established that the use of less lethal munitions to effect the arrest of protesters for serious criminal violations and restore law and order violates an individual's constitutional rights.

[¶53]    It was not clearly established that the use of bean bag rounds on January 18 and 19, 2017, violated an individual's constitutional rights under the specific circumstances here. Instead, it was clearly established law enforcement could use less-lethal force or munitions to effect the arrest of an individual, prevent their flight, and to disperse a crowd to restore law and order to a scene. <u>See</u> <u>Bernini</u>, 655 F.3d at 1006 (determining officers were entitled to qualified immunity on section 1983 claims because discovery revealed plaintiff was not peacefully protesting, but was instead part of a large and potentially riotous group advancing on a police barricade in a threatening manner despite repeated warnings to back up); <u>Burbridge v. City of St. Louis,</u> 430 F.Supp.3d 595, 610-11 (E.D. Mo. 2019) (officers were entitled to qualified immunity of plaintiff's Fourth Amendment claim because plaintiff was part of a disorderly group of protestors and press who refused to disperse despite law enforcement commands to do so); <u>Dundon</u>, 85 F.4th at 1255 (officers were entitled to qualified immunity because it was not clearly established that use of less-

lethal munitions in an intense crowd control setting at the Backwater Bridge violated clearly established constitutional rights).[12]

[¶54]    While Mitchell argues Officer Welk and Deputy Piehl only fired rounds at Mitchell to effect his arrest (Doc. No. 111, p. 35), Mitchell fails to consider the entire situation. Rounds were fired and pushes were conducted for the purpose of restoring law and order to the Backwater Bridge in the face of a riotous group of protestors who refused to listen to commands to disperse and leave the bridge. Law enforcement's purpose of erecting the barricade and being present at the Backwater Bridge was to prevent the unlawful entry of protestors on the bridge.

[¶55]    Mitchell has failed to prove there is existing precedent that squarely governs the specific facts at issue. Therefore, based upon the circumstances present in this case and the relevant caselaw, it was not clearly established at the time that the officers' use of less-lethal munitions on January 18 and 19, 2017, violated Mitchell's constitutional rights.

### 3.  Qualified Immunity Conclusion.

[¶56]    Having considered the arguments, the entire record, and the relevant case law, the Court finds Officer Welk and Deputy Piehl's use of force was objectively reasonable, and is not a violation of Mitchell's Fourth Amendment rights. The Graham factors and the other relevant circumstances weigh in favor of finding there was no unconstitutional excessive force. Mitchell was engaged in serious crimes, threatened law enforcement, and posed a risk of flight. Even if the use of force was unreasonable, it was not clearly established that the use of less-lethal munitions

---

[12] See also Boudin, 962 F.3d at 1041 (trooper entitled to qualified immunity where trooper reasonably believed suspect was about to resume flight from scene); Ehlers, 846 F.3d at 1009-10 (appearance of resisting arrest can justify use of force where); Carpenter, 686 F.3d at 650  (use of force reasonable where suspect engaged in active resistance by refusing officer commands); Kelsay, 933 F.3d at 981 (officers may apply force to regain control of a situation and maintain law and order).

to effect arrest of protestors, preserve the safety of officers, prevent flight of protestors, and restore law and order would violate Mitchell's rights. Additionally, Mitchell has failed to provide more than speculation to support his claim that Officer Welk and Deputy Piehl engaged in more than grossly negligent conduct, which is not actionable under Section 1983. For those reasons, the Court finds Officer Welk and Deputy Piehl are entitled to qualified immunity because the use of force was objectively reasonable under the circumstances.

[¶57]    Because the Court has found Officer Welk and Deputy Piehl did not engage in excessive force, the remaining claims against Sergeant Kennelly, Sheriff Kirchmeier, and Morton County necessarily fail. See Mitchell, 28 F.4th at 903 (reversing the dismissal of "Mitchell's Monell claim against Morton County insofar as this claim asserted liability for the use of excessive force, and [ ] Mitchell's failure-to-intervene claim against Sergeant Kennelly insofar as this claim asserted liability for the use of excessive force.").

## CONCLUSION

[¶58]    For the reasons set forth above, the City and County Defendants (Doc. No. 93) and Sergeant Kennelly's (Doc. No. 105) Motions for Summary Judgment are **GRANTED**. Mitchell's Section 1983 against John Does 1 and 2, the City and County Defendants, and Sergeant Kennelly are **DISMISSED with prejudice**. Because the Court has found officers did not engage in excessive force, Mitchell's remaining Failure to Intervene claim and Monell claim are also **DISMISSED** with prejudice.

[¶59]    **IT IS SO ORDERED**.

[¶60]   **LET JUDGMENT BE ENTERED ACCORDINGLY**.

DATED August 1, 2024.

_____
Daniel M. Traynor, District Judge
United States District Court